Roger M. SHAW and Richard A. Winn, Appellants,

v.

The BOARD OF TRUSTEES OF the FREDERICK COMMUNITY COLLEGE, a Governmental Corporation, et al., Appellees.

No. 75–1902.

United States Court of Appeals, Fourth Circuit.

Argued March 4, 1976.

Decided Dec. 29, 1976.

James J. Lombardi, Upper Marlboro (Joseph S. Casula, College Park, on brief), for appellants.

Edward C. Mackie, Baltimore (Samuel S. Smalkin, Baltimore, on brief), for appellees.

Before HAYNSWORTH, Chief Judge, and BUTZNER and WIDENER, Circuit Judges.

WIDENER, Circuit Judge:

This § 1983[1] action arises out of the dismissal of two college teachers from positions at Frederick Community College, a public educational institution in Frederick County, Maryland, for violating a provision of the college's Policy Manual. We are faced in this appeal with a frequently raised issue in teacher discharge cases—whether the dismissals were for violations of legitimate conditions of employment, or, as plaintiffs claim, for engaging in constitutionally protected activity.

The district court held that plaintiffs were discharged because they willfully and in concert with others failed to take part in two college functions in which their participation was mandatory: a scheduled faculty workshop and commencement exercises. It refused to hold that those violations of the Policy Manual were used as a pretext for the discharge of plaintiffs for exercising rights protected under the First Amendment.

We agree with the district court's conclusion that the discharges were not pretextual. We do not agree with plaintiffs' claim that the discharges did not comport with the requirements of the due process and equal protection clauses of the Fourteenth Amendment. We therefore affirm.

Roger Shaw and Richard Winn had been teaching at Frederick Community College since 1968 and 1969, respectively. At the time the events to be described below occurred, Professor Shaw was tenured, and Professor Winn was under a continuing appointment.[2] Both were designated Division Chairmen, positions that entailed considerable administrative responsibilities in addition to teaching duties.

The Policy Manual, which sets forth regulations adopted by the Board of Trustees for the governance of the college, and which all teachers were expected to be familiar with, specifically imposed upon Shaw and Winn the obligation to attend and par-

---

1. 42 U.S.C.A. § 1983 reads as follows:

   "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

2. Under a continuing appointment, a member of the professional staff would receive a three year contract, after having completed a probationary period, that could thereafter be renewed on certain conditions.

   No assignments of error are directed at the rights of Shaw and Winn to hearings prior to dismissal, which both received, and which we assume they would be entitled to under *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

ticipate in, among other things, commencement and scheduled workshops.[3]

The sequence of events that culminated in the dismissals of Shaw and Winn began in the fall of 1971, when the Board of Trustees decided to replace the tenure system with a system of continuing appointments for all non-tenured faculty. The tenured teachers were protected by a grandfather clause. This decision sparked considerable faculty dissent, which, over the next two academic years, resulted in a movement for the creation of a new faculty organization, and eventually in demands for recognition of such an organization for the purpose of collective bargaining with the trustees. At a meeting held on May 9, 1973, at which twenty-one members of the faculty were present, including Professors Shaw and Winn, a resolution was adopted that the faculty "will not meet any professional obligations until the Board grants negotiating rights." While Shaw and Winn apparently spoke against this resolution, it is admitted they refused to perform the obligations for which they were discharged.

The trustees were hesitant to approve formal recognition of an exclusive bargaining agent for the faculty because of concern, verified by the Maryland Attorney General, that such action might violate state law. At a meeting held on May 16, 1973, however, the trustees proposed a limited form of recognition, subject to conditions found unacceptable by certain members of the faculty. The intention of this group, which included Shaw and Winn, not to meet their professional obligations until negotiating rights were granted, was reiterated.

The following day, the dissident faculty members held a meeting, at which it was resolved that they would attend commencement on May 20th, but would not march in the procession in academic regalia nor sit in the designated section of the auditorium. Although the district court credited evidence that Professors Shaw and Winn endeavored to temper the more militant desires of some of those in attendance, it is conceded that they were among thirty faculty members who boycotted a faculty workshop scheduled for May 17th, and that they took part in the planned failure to participate fully in commencement three days thereafter.

On about May 22, 1973, Professors Shaw and Winn received letters from Dr. Stephens, the college president, stating that termination of their employment as of June 30, 1973 was being considered. The assigned reasons were that they willfully and in concert with others refused to attend the workshop on May 17, 1973, and refused to participate in commencement exercises on May 20th.

These letters, which were received in slightly different form by the other protesting faculty members who were not Division Chairmen, far from represented an irrevocable decision of dismissal. Indeed, Dr. Stephens made known his desire to meet with each protestor, and solicited letters from each explaining his actions. Everyone understood the deadline for action by Shaw and Winn was June 30th. Following discussions in mid-June with an attorney representing all (including Shaw and Winn) but one of those who received termination letters, Dr. Stephens indicated that termination proceedings would be dismissed against all those who met the following conditions: Acknowledged that the activities engaged in were a neglect of professional duties; promised not to participate in such activities in the future; and agreed that the Policy Manual was the basis upon which the college would be run. Dr. Stephens even agreed to accept a prepared form letter[4] incorporating these conditions,

---

3. Section 3.203–2c of the Policy Manual states:
    "Attendance and participation shall be required at Commencement, scheduled staff meetings, scheduled work shops, and other scheduled activities."

Copies of the manual are given to all professional staff members upon entering employment.

4. The form and substance of the letter was prepared by Dr. Stephens with the advice of his

subject to the requirement that each faculty member desiring to avail himself of this procedure also have a personal conference with him.

Professors Shaw and Winn, despite the availability of this form letter procedure, failed to take action to head off dismissal proceedings prior to their deadline of June 30th. The record reflects Dr. Stephens' continuous desire prior to that date to sit down and discuss the matter with them, and his encouragement that they accept the conditions that had been set forth. They declined to do so, however, until July 2, 1973, Professor Winn having previously indicated his unwillingness to admit that he had neglected his professional duties.

When letters similar to those that had previously been found acceptable were finally received from Shaw and Winn on July 2nd,[5] Dr. Stephens advised the two that their action had come too late and that the matter had been referred to the Board of Trustees.

Following hearings by the Board in July and August, at which Shaw and Winn were represented by their attorney, an alternative to dismissal was offered to the four remaining faculty members, including Shaw and Winn, who had failed to meet the June 30th deadlines. They were offered one year employment contracts, provided they perform work off campus. Shaw and Winn declined this offer, and were subsequently discharged.

I

■ At the outset, we delineate the limited scope of our inquiry in this case. While courts have not hesitated to require the setting aside of school board action that penalized teachers for the exercise of First Amendment rights, *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Johnson v. Branch,* 364 F.2d 177 (4th Cir. 1966), cert. den. 385 U.S. 1003, 87 S.Ct. 706, 17 L.Ed.2d 542 (1967), we will not second guess such bodies on mat-

ters within their discretion that do not rise to the level of constitutional deprivations. *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Wood v. Strickland,* 420 U.S. 308, 326, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Kirker v. Moore,* 436 F.2d 423 (4th Cir. 1971). "It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion," *Wood,* 420 U.S. at 326, 95 S.Ct. at 1003, or because of mistake, *Bishop,* 96 S.Ct. at 2080.

■ With this in mind, we proceed to the question of whether the dismissals constituted a denial of plaintiffs' rights of association and expression guaranteed by the First Amendment, as they claim. They, of course, did not surrender those rights by virtue of accepting employment in a public educational institution. E. g., *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). They had every right to disagree with the changing of the tenure system and the trustees failure to grant formal bargaining rights with the college administration, and to say so. But because their position is that they could not, consistently with the First Amendment, be discharged for violating the terms of their employment simply because those violations were a part of such a protest, it must be rejected.

In *Chitwood v. Feaster,* 468 F.2d 359 (4th Cir. 1972), while we held that certain teachers were entitled to a determination of whether or not they were discharged for engaging in constitutionally protected activity, we stated, "A college has a right to expect a teacher to follow instructions and to work cooperatively and harmoniously with the head of the department," and that one "does not immunize himself against [the] loss of his position simply because his non-cooperation and aggressive conduct are verbalized." 468 F.2d at 361.

attorney and agreed to by the attorney for Shaw and Winn.

**5.** The letters of Shaw and Winn were dated July 1, 1973.

Appellants' reliance on *Tinker v. Des Moines School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); and *Starsky v. Williams,* 353 F.Supp. 900 (D.Ariz. 1972), aff'd in part, rev'd in part on other grounds and remanded, 512 F.2d 109 (9th Cir. 1975), is misplaced. In each of these cases, plaintiff was penalized for engaging in conduct closely akin to pure speech. The teacher in *Pickering* was discharged for publishing a letter in a newspaper critical of past actions of his school board in handling proposals to raise new revenue, and in allocating revenue between athletic and scholastic programs. In reversing, the Supreme Court stated that the case was one in which this conduct in no way "impeded the teacher's proper performance of his daily duties in the classroom or . . . interfered with the regular operation of the schools generally." 391 U.S. at 572, 88 S.Ct. at 1737.

Similarly, in *Tinker,* where students were suspended from school for wearing black armbands as an expression of opposition to our involvement in Vietnam, the Court repeatedly stressed that the case did not concern speech or action that intruded upon the work of the school or the rights of other students. 393 U.S. at 508, 89 S.Ct. 733.

*Starsky* did involve one charge similar to those involved here—unauthorized absence of a teacher from class—but the district court found that 6 of the 8 total charges were not supported by sufficient evidence and arose out of constitutionally protected activity, such as delivering a speech and distributing literature, and that those activities constituted the primary motivation for Starsky's discharge. 353 F.Supp. at 926–927.

The conduct of Shaw and Winn went beyond pure speech into the realm of breach of the express obligations of their employment. They admit that they willfully absented themselves from the scheduled workshop and failed to participate in commencement in the manner expected of them. It was within the discretion of the

Board of Trustees to discharge them for those reasons. See *Kirker v. Moore,* 436 F.2d 423 (4th Cir. 1971).

Even assuming, which we do not decide, that this case contains aspects of pure speech found compelling in *Tinker* and *Pickering,* our inquiry is limited to ascertaining whether Shaw and Winn were discharged for the assigned reasons, or whether the real motivation of the trustees involved constitutionally protected activity. The alleged arbitrariness of the June 30 deadline for submitting a letter of contrition, and the alleged minor nature of the infractions, are relevant to us only insofar as they bear on the existence of an impermissible, ulterior motive for the discharges; they have no independent significance on the constitutional level here.

In *Johnson v. Branch,* supra, for example, Mrs. Johnson had committed minor infractions of school rules. Our holding requiring her reinstatement was based not on the school committee's lack of right to predicate her dismissal on such minor infractions, but rather on the court's view that the real reason for her discharge was her community civil rights activity.

Examining the record in this case, it belies the existence of an impermissible motivation for the discharges. It would be more accurate to state that it reflects a college administration willing to bend over backward to avoid having to discharge anyone, but unwilling to acknowledge the right of its teachers to disregard the rules with impunity.

Dr. Stephens solicited letters of explanation and personal conferences with all affected faculty members. He negotiated with the attorney representing the protestors, and was willing to accept a form letter, agreed to by plaintiffs' attorney, acknowledging breach of professional obligations and promising to abide by the Policy Manual in the future, as long as it were accompanied by a personal conference. When the form letter proved unacceptable to one of the protesting faculty, Dr. Stephens permitted her to submit a version of her own. Charges were dropped against all

who were willing to follow this simple procedure, although the college was under no obligation to do so.

Even after the deadline of June 30 had expired without Shaw or Winn having met Dr. Stephens' conditions, the Board of Trustees offered them one year contracts as an alternative to dismissal. They declined to avail themselves of this second opportunity to avoid discharge, and now ask the court to provide a third opportunity. This we cannot do.

■ Perhaps Dr. Stephens could have accepted the letters he received July 2nd on the same terms as if they had been submitted earlier, without inconvenience to the administration of the college, but that does not make his refusal to do so a violation of the Constitution. As we have said, he was under no obligation to accept letters of contrition from the protestors, at any date.

Even if the June 30 deadline were arbitrary, which we do not decide, that fact at most would bear relevance to the existence of an impermissible motivation for the discharges. The record as a whole effectively refutes the notion that the Board of Trustees acted pretextually, however, and the findings of fact of the district court, which heard evidence *ore tenus,* that the discharges were for violations of the rules of the college, and not pretextual, are not clearly erroneous. FRCP 52(a).

## II

■ We have considered plaintiffs' assignment of error pertaining to the alleged denial of their rights to equal protection of the laws, and find it lacking in merit. This claim is based on the fact that Professors Shaw and Winn were subjected to a June 30th deadline for submitting an acceptable letter to Dr. Stephens, while other faculty members had until August. The district court found a rational basis for the different dates, in that Shaw and Winn, as Division Chairmen, were classified as "twelve month administrators," whose new contract year commenced on July 1st, while the others were not. We agree with the district court's analysis of this issue.

We are thus of opinion the judgment of the district court should be, and it is, accordingly,

AFFIRMED.

BUTZNER, Circuit Judge (dissenting):

As a preface to his opinion, the district judge wrote:

"This is a case in which the naivete and misjudgments of the plaintiffs, combined with their apparent lack of competent advice, have resulted in the loss of their responsible jobs at the Frederick Community College although others, more culpable than the plaintiffs, did not suffer the same fate. This seemingly anomalous result was brought about through a series of misunderstandings, misinterpretations, and misadventures, outlined in substance in this opinion, which, in combination, provided legal justification for the action taken by the Board of Trustees of the Frederick Community College in ending the employment of the plaintiffs."

Except for the judge's assessment of the competency of the legal advice Dr. Shaw and Dr. Winn received, I agree with his comment on the evidence. I do not agree with his conclusion that the facts "provided legal justification" for the college to discharge these professors. Therefore, I would reverse the judgment of the district court, and direct their reinstatement.

## I

The college ostensibly dismissed Shaw and Winn for insubordination and neglect of duty. It based these charges on their refusal to attend a workshop and fully participate in commencement ceremonies. Actually, it fired them because they joined other faculty members in protesting the college's employment policies.

In *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972), the Court, speaking of a professor's employment by a state university, said:

"For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable gov-

ernmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech."

That such a denial of first amendment rights was the true motive of the college's officials is disclosed by the fact that on other occasions other faculty members, who skipped graduation or workshops, were not discharged. The college simply reprimanded them or docked their pay. In at least one instance, it assessed no penalty for an unexcused absence from a workshop.

At the trial, the college justified its disparate treatment by drawing a distinction between infractions of the rules by individual faculty members and infractions of the same rules by a group of the faculty. The distinction on which the college relies, it seems to me, is an admission that Shaw and Winn were discharged because they acted in concert with their fellows to protest a college policy. It dispels any notion that they were in reality discharged because they did not attend a workshop or participate in the commencement exercises. The district judge's omission of any reference to the disparity between the severe punishment meted out to Shaw and Winn and the lenient punishment of other faculty members, who, on other occasions, had violated the same rules, fatally infects his conclusion that the reason assigned by the college for the discharges was not a pretext.

Though camouflaged as discharges for breaking a college rule, the college's retaliation against Shaw and Winn for acting in concert with other members of the faculty to protest its employment policy violates the precepts so clearly stated in *Perry*. For this reason alone the judgment of the district court should be reversed.

## II

Even were I to accept the college's avowal that no pretext was involved in the dismissal of these professors, I would conclude that the judgment of the district court cannot stand. The college takes the position that while the faculty members could oppose the college's policy, they could not demonstrate their opposition by missing a workshop and refusing to march, clothed in cap and gown, in the academic procession at commencement without suffering dismissal. If the court's function ends with ascertaining only the facts on which the college relies, then, of course, the college must prevail. I believe, however, that deciding whether the first amendment afforded protection to Shaw and Winn requires more extensive inquiry into both the law and the facts.

A teacher's first amendment rights are not absolute. The exercise of these rights cannot interfere with the proper performance of the teacher's duties or with the regular operation of the school. *Pickering v. Board of Education,* 391 U.S. 563, 571–74, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Therefore, ascertaining the balance between constitutionally protected and unprotected conduct requires consideration of both the teacher's behavior and its effect on the college. To make this appraisal the following facts should be considered:

¶ Except for the charges preferred in this case, both Shaw and Winn had exemplary records at the college. They were well qualified for their duties, and the performance of their work was unblemished.

¶ They joined with other faculty members in announcing that their absence from the workshop and their attendance at commencement, without wearing academic regalia, was solely to protest the college's employment policy.

¶ They confined their protest to these two functions and fully performed their other duties.

¶ The subject of the protest was an economic and political issue.

¶ Shaw and Winn refused to strike against the college, and they persuaded more impatient members of the faculty to forego drastic action.

¶ At all times, they acted in good faith under the advice of competent counsel.

I believe the effect of their conduct on the college was minimal for the following reasons:

¶ They attended the commencement, plainly identified by name tags, and sat with a majority of the faculty in a special section. They did not disrupt the ceremony. Their refusal to appear in cap and gown was not shown to have interfered in any way with the regular operation of the college. It was a symbolic gesture tantamount to the wearing of an armband which the Supreme Court deemed subject to first amendment protection in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

¶ The workshop they missed dealt with budgeting. There is no evidence that their absence in any way impeded the performance of their own duties or interfered with the work of others.

¶ The triviality of their transgressions is demonstrated, as I mentioned in Part I, by the fact that other faculty members, who violated the same rule by similar conduct on other occasions, received little or no punishment.

Balancing the undisputed facts persuades me that the right of Shaw and Winn to protest the college's employment policies was protected by the first amendment. They did not forfeit this protection, for their protest neither impaired their own work nor interfered with the operation of the school.

### III

Finally, the college unfairly singled out Shaw and Winn even after they had been notified that they would be dismissed on June 30. The college reinstated each protesting member of the faculty, who delivered a letter of contrition by June 30, and permitted still others to make amends as late as August. June 30 fell on a Saturday. Shaw and Winn delivered their letters on Monday, July 2. Nevertheless, the college rejected their letters because they were not received by the June 30 deadline, and it declined to reinstate the men. The district court upheld the different treatment accorded Shaw and Winn on the ground that while they, as division chairmen, were classified as administrators whose contract year commenced on July 1, the others were not administrators. I believe that the district court's conclusion that this classification was rational for the purpose of disciplining Shaw and Winn is not supported by either the law or the facts.

In *Reed v. Reed*, 404 U.S. 71, 75–76, 92 S.Ct. 251, 253, 30 L.Ed.2d 225 (1971), the Supreme Court succinctly restated the principles governing the application of the equal protection clause:

> "In applying [the equal protection] clause, this Court has consistently recognized that the Fourteenth Amendment does not deny to States the power to treat different classes of persons in different ways. . . . The Equal Protection Clause of that amendment does, however, deny to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'"

The facts of this case show that classifying Shaw and Winn differently from the other faculty members for the application of a June 30 deadline was unreasonable and arbitrary. The deadline bore only a nominal relation to them. The previous year, the college had granted Shaw tenure and Winn a continuing appointment. Therefore, their right to employment did not automatically expire on June 30. On the other hand, if their conduct warranted dismissal, the college was under no obligation to continue employing them until June 30. The June 30 date was irrelevant for the purpose of determining whether they

should be discharged. Moreover, there is no evidence that the college had taken any steps between June 30 and July 2 to hire any replacements, and it was not in any other way prejudiced by the weekend delay. Since the regulation classifying Shaw and Winn as administrators bore no relation whatsoever to reinstating them either before or after the June 30 deadline, I conclude that the college denied them the equal protection of the laws.

The college's belated offer of one year contracts did not remedy the wrong done these men. The withdrawal of tenure and the cancellation of the continuing appointment constitute, in my opinion, unacceptable punishment for the exercise of first amendment rights.

A citizen's contest with any level of government over economic and political issues is, at best, a difficult undertaking. It becomes almost insurmountable when the first amendment's protection against retaliation for protesting government policies is withdrawn for trivial and unsubstantial reasons. I would reverse the judgment of the district court.