Jay CHERRY, Deborah Dean and A. Wardell Thomas, Plaintiffs,

v.

Calvin W. BURNETT, President, Coppin State College, J. Carson Dowell, Chairman, Board of Trustees of the Maryland State Colleges, and H. Gray Reeves, M. D., Edgar F. Berman, M. D., Frank A. DeCosta, Jr., Leo E. Green, Mrs. Frances L. Murphy II, Victor Frenkil, A. Harris Grossman and James A. Sensenbaugh, Members of the Board of Trustees of the Maryland State Colleges, Defendants.

Civ. No. H–75–1087.

United States District Court, D. Maryland.

Nov. 23, 1977.

Ann F. Hoffman, Baltimore, Md., for plaintiffs.

Glenn E. Bushel, Asst. Atty. Gen., Baltimore, Md., for defendants.

ALEXANDER HARVEY, II, District Judge.

The three remaining plaintiffs in this civil action are former non-tenured members of the faculty of Coppin State College (hereinafter "Coppin"), a state-supported institution.[1] They have here sued the Pres-

---

1. There were six plaintiffs who filed the original complaint. The claims of plaintiffs Gordon and Teplitz were dismissed with prejudice before the trial, and the claim of the plaintiff Snowden was dismissed pursuant to Rule 41(b), F.R.Civ.P., at the close of the plaintiffs' case.

ident and the members of the Board of Trustees of the Maryland State Colleges in their official capacities, seeking reinstatement,[2] back pay and other injunctive relief under 42 U.S.C. § 1983 because of the alleged unlawful termination of their employment contracts by the defendants. Plaintiffs are all members of the Coppin Federation of Teachers, Local 2036 of the American Federation of Teachers, AFL–CIO (hereinafter "CFT"), and they claim that they were dismissed from their teaching positions at Coppin in violation of their constitutional rights under the First and Fourteenth Amendments.[3] They assert that their employment was terminated because of their membership in the CFT and their outspoken opposition to the administration of the President, Dr. Calvin W. Burnett.

In opposing the plaintiffs' claims for relief, the defendants assert that the teaching contract of each plaintiff was not renewed because of reasons unrelated to the exercise by each plaintiff of his or her constitutional rights. The defendants contend that budgetary reasons required the elimination of certain faculty positions at Coppin, and that because of plaintiffs' poor performance or weakness as teaching members of the faculty, the decision was made not to rehire each of them.

■■■ Each plaintiff here was non-tenured and thus had been hired by Coppin on a temporary basis. Nevertheless, it is established that First Amendment claims asserted by teachers under § 1983 are not defeated by the fact that the teacher did not have tenure. *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 283, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Although no reasons at all need be given for the discharge of a non-tenured teacher and although such a teacher has no constitutional right to a hearing prior to the decision not to rehire him, *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), such a teacher may nonetheless establish a claim to reinstatement and other relief if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment rights. *Perry v. Sinderman,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). As the recent *Mt. Healthy* decision of the Supreme Court indicates, the burden in a case such as this one is initially placed upon the plaintiffs to show that their conduct was constitutionally protected and that such conduct was a substantial or motivating factor in the decision of the school officials not to continue their employment. *Mt. Healthy City Board of Education v. Doyle, supra,* 429 U.S. at 287, 97 S.Ct. 568. Once the plaintiffs in a case such as this one have carried their initial burden, the Court must go on to determine whether the defendants have shown by a preponderance of the evidence that they would have reached the same decision as to the plaintiffs' reemployment even in the absence of the protected conduct. *Idem,* 429 U.S. at 287, 97 S.Ct. 568.

Following extensive pretrial proceedings, this case came on for trial before the Court sitting without a jury.[4] Various witnesses testified, and numerous exhibits were admitted in evidence. The issues presented to the Court in the trial were (1) Have the plaintiffs satisfied their initial burden of showing that their conduct was constitutionally protected and that this conduct was a substantial or motivating factor in the decision of the defendants that their teaching contracts not be renewed? and (2) If the plaintiffs have satisfied their initial burden, have the defendants shown by a

---

2. Plaintiff Thomas does not wish to be reinstated as a member of the faculty of Coppin, but he is seeking other appropriate relief.

3. The original complaint also named as additional parties defendant the Governor of Maryland and the Board of Trustees as an entity. Prior to trial, motions to dismiss were granted as to these additional defendants.

4. The plaintiffs' application for a Temporary Restraining Order which would have restored them immediately to their previous teaching positions was denied by Judge Young of this Court on the day that suit was filed. Thereafter, following a hearing, the undersigned Judge denied the plaintiffs' motion for a preliminary injunction.

preponderance of the evidence that they would have made the same decision as to the plaintiffs' re-employment even in the absence of the protected conduct?

I

*The facts*

At the time of the matters in suit, Dr. Calvin W. Burnett, one of the named defendants, was President of Coppin. Dr. Burnett was appointed President by the Board of Trustees of the Maryland State Colleges in 1970. As chief administrative officer, he recommended to the Board that the teaching contracts of each of the plaintiffs not be renewed after the 1974–75 academic year. When these recommendations were approved by the Board, the employment of the plaintiffs was terminated effective June 30, 1975.

The CFT is a labor organization composed of many members of the Coppin faculty. The Union was chartered in the 1969–1970 school year, and its membership from time to time has included from 50% to 60% of the members of the Coppin faculty. Under Maryland law, state public employees do not have the right to be represented by a union as their official collective bargaining agent. Nevertheless, the CFT has been recognized at Coppin as an official campus organization and was permitted to use campus facilities for meetings.

In April of 1974, many of the students at Coppin had staged a boycott and had refused to attend classes for a week. The CFT not only supported the students but, at a membership meeting held on April 23, 1974, voted to call for the resignation of President Burnett. In a letter from Dr. Richard Bright, President of the Union, to defendant Dowell, Chairman of the Board of Trustees of the Maryland State Colleges, the CFT listed various "long term" grievances and recommended that Dr. Burnett be removed as President of Coppin. The Union's position was not directly communicated to Dr. Burnett, who learned through newspaper articles that the CFT was asking that he be replaced. The Board of Trustees considered the nature of the grievances list-

ed by the Union at a meeting held on May 2, 1974 and concluded that most of them were attributable to the difficult fiscal problems with which the College had been faced. A public statement was issued by the Board, commending Dr. Burnett for "the splendid job" he had been doing "under difficult conditions." By letter dated May 20, 1974, Chairman of the Board Dowell conveyed to Dr. Burnett the wholehearted support and confidence of the Board in his efforts to resolve the problems confronting him as President. Dr. Bright was informed of the Board action by letter dated June 5, 1974.

There are three separate plaintiffs in this case, and as might be expected, the facts as to the hiring, the performance and the termination of each differ somewhat. All three were members of the CFT, and all were non-tenured members of the faculty who had been hired on a temporary basis. When the President and the members of the Board of Trustees decided not to renew the teaching contract of each plaintiff, this was an individualized decision, and resolution of the issues in this case accordingly requires an examination of the separate facts as to each of the three plaintiffs.

(a) *The plaintiff Cherry*

Jay Cherry, a white male, was the eldest and most experienced of the three plaintiffs. He had received a bachelor's degree in 1944, a master's degree in 1945 and had some prior experience teaching at a college level before he came to Coppin. Plaintiff Cherry was employed as an Associate Professor of Special Education at Coppin from September 1, 1972 through June 30, 1975. He was hired to teach in a new Special Education program in the Graduate School of Coppin. However, his principal background had been in speech pathology, and he admittedly had difficulty teaching the graduate course to which he had been originally assigned during the first semester of the 1972–1973 school year. There were numerous complaints by students, and on December 15, 1972, plaintiff Cherry was advised by Dr. George Taylor, Chairman of

the Department of Special Education, that he would be transferred to another graduate program effective February 4, 1973. He was further told that if his performance did not improve, his employment would be terminated effective June 1973. In January 1973, Dr. Taylor informed Dr. LeRoy Fitzgerald, the Director of Graduate Studies, that plaintiff Cherry was being transferred from the new program, and Dr. Taylor expressed reservations about retaining plaintiff Cherry as a faculty member.

However, this transfer within the Graduate School likewise did not prove to be successful. Accordingly, it was decided to try plaintiff Cherry as an undergraduate instructor and for the academic year 1973–1974, he was transferred to an undergraduate program in the Department of Special Education. In September 1973, plaintiff Cherry became a member of the CFT. On December 4, 1973, Dr. Taylor reported to Dr. Charles Sanders, Dean of the Education Division, that negative complaints from students were continuing as to plaintiff Cherry's performance. Dr. Taylor stated that Cherry's expertise was in the area of speech, and since Coppin had no speech major at the time, it was recommended that plaintiff Cherry not be re-employed in the Department of Special Education for the 1974–1975 academic year.

By letter dated February 26, 1974, plaintiff Cherry was notified by Dr. Burnett that his contract would not be renewed for the 1974–1975 academic year because of serious budgetary limitations. Apparently, plaintiff Cherry did not receive this letter until March 2, 1974. Under a governing policy adopted by the Board of Trustees of the State Colleges of Maryland, written notice of non-renewal for the following year must be given not later than March 1 during the initial period of a probationary appointment, not later than December 15 during the second year of a probationary appointment and not later than twelve months prior to the expiration of a subsequent appointment. Upon the recommendation of an Assistant Attorney General,

Dr. Burnett, by letter dated April 29, 1974, withdrew his letter of February 26, 1974, thus permitting plaintiff Cherry to remain as a faculty member through the academic year 1974–1975. However, plaintiff Cherry was formally notified that his services would be terminated at the conclusion of the 1974–1975 academic year and that his contract would not be renewed for the 1975–1976 academic year.

Having been successful in continuing his employment for another year, plaintiff Cherry's performance during 1974–1975 improved. Dr. Taylor, on March 10, 1975, recommended that plaintiff Cherry be retained for another year, and several other members of the faculty likewise wrote letters in his behalf. However, by the Spring of 1975, it was not possible to retain plaintiff Cherry as a faculty member of Coppin. The institution's budget had been cut by the Legislature, and it was necessary to reduce the faculty so as to be able to operate within budgetary limitations. The number of allocated faculty positions at Coppin were 138 for 1974–1975, 122 for 1975–1976 and 111 for 1976–1977.[5] Cherry's position was one of those which President Burnett had previously included in a list of those sixteen to be eliminated for the academic year 1975–1976, and by the Spring of 1975, it was not possible to eliminate the position of some other member of the faculty so that plaintiff Cherry could be retained. When this was explained to Dr. Taylor, he withdrew his recommendation that plaintiff Cherry be re-employed for the 1975–1976 academic year. The plaintiff Cherry's employment at Coppin was discontinued on June 30, 1975.

### (b) The plaintiff Thomas

A. Wardell Thomas, a black male, graduated from college in 1961, received his master's degree in 1969 and, before he came to Coppin, had taught in a high school in Harford County. Plaintiff Thomas was hired as an Assistant Professor of Art and commenced his teaching duties at Coppin in the

---

5. The parties have stipulated to these figures.

Fall of 1972. During the 1973–1974 school year, he became a member of the CFT and later became a member of the Executive Committee and was elected a Second Vice President.

The Chairman of the Art Department at the College was Mr. Luke A. Shaw. During the academic year 1972–1973, Mr. Shaw was on a study leave, and plaintiff Thomas was Acting Chairman of the Art Department in his absence. When Mr. Shaw returned during the Fall of 1973, he was quite dissatisfied with the manner in which plaintiff Thomas had run the Department, and he expressed his displeasure to Thomas. During the first semester of the 1973–1974 school year, Mr. Shaw made an effort to personally observe the performance of plaintiff Thomas, and he eventually decided that he would not recommend that plaintiff Thomas be rehired the following year. In a written memorandum, Mr. Shaw detailed the deficiencies he had observed, concluding that Plaintiff Thomas was generally deficient in the performance of his duties, that plaintiff Thomas had been evasive and indifferent when Mr. Shaw discussed his deficiencies with him, and that Mr. Thomas had been uncooperative with his superiors and had generally shown a poor attitude.

By letter dated February 28, 1974, President Burnett notified plaintiff Thomas that his teaching contract would not be renewed for the following year. Like plaintiff Cherry, plaintiff Thomas claimed that he did not receive this letter until after March 1, 1974 and that therefore the notice of non-renewal was ineffective. When President Burnett did not, as he had in the case of plaintiff Cherry, withdraw his notice of termination, plaintiff Thomas engaged an attorney, namely Neal D. Borden, Esq., of the firm of Venable, Baetjer & Howard. By letter dated August 14, 1974, Mr. Borden demanded that the contract of plaintiff Thomas be reinstated, threatening suit. By letter dated September 9, 1974, President Burnett wrote plaintiff Thomas in care of his attorney, advising that although he had found no basis for the contentions which had been made, he would agree to retain plaintiff Thomas for the academic year 1974–1975 in order to avoid "any needless dispute over the question of timely notice which may arise from your prior employment * * *." However, President Burnett stated that the employment of plaintiff Thomas would terminate at the end of the academic year on June 30, 1975, and he asked plaintiff Thomas to agree to the terms of his retention by signing and returning the letter. Plaintiff Thomas did in fact "understand and agree" to this request by signing and returning the letter. Accordingly, he continued as a member of the faculty of Coppin during the 1974–1975 year, his employment finally terminating on June 30, 1975.

### (c) *The plaintiff Dean*

Deborah Dean, a black female, was the most inexperienced of the three plaintiffs. She was only 22 years of age when she was employed as an Instructor in Political Science at Coppin. Plaintiff Dean had herself attended Coppin State College, receiving her bachelor's degree in 1971. The following year, she received her master's degree at Rutgers University, and she had little or no teaching experience before she joined the Coppin faculty. She first taught at Coppin during the summer term of 1972, and she joined the CFT in January of 1973, later becoming the Corresponding Secretary of the Union and a Member of its Executive Committee.

Plaintiff Dean from the outset of her employment at Coppin had an exaggerated sense of her experience and abilities, which quite naturally led to conflicts with her superiors. Members of the faculty at Coppin, in order of rank, include professors, associate professors, assistant professors and instructors. After being an instructor for one full academic year and part of a summer term, plaintiff Dean claimed that she had been promised promotion to assistant professor, so stating in a letter dated July 22, 1973 to Flossie Dedmond, Dean of the Division of Arts and Sciences. In her reply, Dean Dedmond (although agreeing that an error had been made as to plaintiff Dean's salary for 1973–1974), pointed out to

plaintiff Dean that she could hardly be expected to receive a regular promotion after less than two years' teaching experience, much less a "jump" promotion from the rank of instructor to the rank of associate professor. Dean Dedmond urged plaintiff Dean to "burn the midnight oil" and be patient if she wished to be promoted.

Plaintiff Dean felt that she was not being treated fairly at Coppin, particularly since certain other instructors were being paid more than she was. On March 13, 1974, plaintiff Dean wrote a letter to Dean Dedmond, suggesting that the faculty and the administration had "lost sight of the real reason" for Coppin's existence. She complained, *inter alia*, that financial aid checks for students were being delayed, that it was next to impossible for students to receive information from the faculty or the administration and that the College buildings were not being cleaned properly.

In several communications which the plaintiff Dean sent to Dean Dedmond, she revealed deficiencies in sentence structure, clarity, spelling and punctuation, which led Dean Dedmond to doubt that the plaintiff Dean had the competence to teach students at a college level. Dean Dedmond had expressed concern as to the strength of the College's Social Sciences Department, and had indicated that it might be necessary to revitalize the Department and terminate some of the present members. Dean Dedmond eventually concluded that the plaintiff Dean needed more professional maturity, and she brought to the attention of the Dean's Council[6] and President Burnett her views concerning the weaknesses of the plaintiff Dean as a member of the faculty. At that time, Dean Dedmond did not know that plaintiff Dean was a member of the CFT. By letter dated June 14, 1974, the plaintiff Dean was notified by President Burnett that her contract would not be renewed beyond her probationary period ending June 30, 1975. Pursuant to this

letter, the plaintiff Dean was terminated on June 30, 1975.

## II

### *The plaintiffs' burden*

■ When these facts are considered under the standards of *Mt. Healthy City Board of Education v. Doyle, supra,* it is clear that plaintiffs have adequately shown that the conduct in question was constitutionally protected. Plaintiffs were all members of the CFT, which had publicly opposed the continuation of the defendant Burnett as President of Coppin. Teachers employed by the State have a First Amendment right to form and join a labor union. *McLaughlin v. Tilendis,* 398 F.2d 287 (7th Cir. 1968). An individual cannot be dismissed from public employment in retribution for the exercise of his or her First Amendment rights. *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). Therefore, insofar as the initial burden placed upon plaintiffs in this case is concerned, the key issue here is whether plaintiffs have proved that the protected conduct in question was a substantial or motivating factor in the decision of the defendants not to renew their teaching contracts.

■ After considering the evidence produced and giving due weight to the credibility of the witnesses, this Court concludes that the plaintiffs have not met their burden of proving that their employment at Coppin was terminated because of the exercise by them of their First Amendment rights. What the evidence does disclose here is a State-supported institution, compelled by fiscal requirements to cut down on the size of its faculty, which eliminated the positions of these untenured faculty members whose performance for various

---

**6.** The Dean's Council, which met every other week, was composed of the President, the five College Deans and the Vice President for Academic Affairs.

reasons had proven to be unsatisfactory. This Court finds that there were several reasons why the contract of each plaintiff was not renewed. However, the fact that they were members of a Union whose leaders had spoken out against the continuation of Dr. Burnett as President[7] was not a substantial or motivating factor for the defendants' decisions not to retain them.

From the testimony of Dr. Burnett and of other witnesses called by the defendants (many of whom were themselves members of the CFT), this Court finds that membership in the Union played no part in the decisions made by the defendants not to renew the plaintiffs' teaching contracts.[8] Although hardly agreeing with the Union's call for his resignation as President, Dr. Burnett did not feel particularly threatened by the presence of the CFT on the campus, even after it called for his resignation. The Union's demand that Dr. Burnett be removed was rejected by the Board of Trustees, which publicly commended him for doing a splendid job under difficult conditions. From time to time, Dr. Burnett had met with officers of the Union and listened to their complaints concerning the running of the College. However, as far as Dr. Burnett was concerned, the Faculty Senate was the Coppin body with which he regularly dealt concerning faculty matters, and he treated the Union as merely another campus interest group. With from 50% to 60% of the faculty being members of the CFT, Dr. Burnett was never sure which of his faculty were associated with the Union and which were not. President Burnett did not know that plaintiffs Cherry and Thomas were members of the Union until after February of 1974, and he did not know that plaintiff Dean was a member of the Union

until after August 1974. He had never seen a list of Union members nor had he asked that one be compiled.

Plaintiffs place heavy reliance on the fact that the Union supported the student boycott in April 1974 and later petitioned the Board of Trustees for the removal of Dr. Burnett as President. But these facts hardly support the claims of the plaintiffs Cherry and Thomas, both of whom were notified before the student boycott that their contracts would not be renewed. Insofar as the plaintiff Dean is concerned, President Burnett did not even know that she was a member of the Union until after she was notified that her contract would not be renewed following the 1974–1975 academic year.

Had President Burnett wished to "crush" the Union as contended by the plaintiffs, it would have been more reasonable to have expected retaliatory action by him against the top leadership of the CFT rather than against a few probationary employees who had been members of the faculty for less than two years when they were notified of the termination of their contracts. Dr. Daniel Kim was one of the charter members of the CFT and served as its President in 1970–1971. After that date, he became Chairman of the Department of Social Sciences and was promoted from Associate Professor to full Professor. Dr. Richard Bright was President of the CFT in 1973–1974. He became a fully-tenured member of the faculty in 1974–1975 and was promoted from Assistant Professor to Associate Professor. These promotions and assignments of top Union officials were approved by Dr. Burnett at times when plaintiffs contend he possessed an anti-union bias.[9]

---

7. The evidence does not indicate that the plaintiffs themselves publicly expressed strong views in opposition to the administration of defendant Burnett or that their position on this issue was ever communicated to Dr. Burnett.

8. This Court found Dr. Burnett to be an entirely credible witness. He was forthright and candid in responding to the questions put to him, and his testimony is supported by other evidence in the record.

9. Both Dr. Kim and Dr. Bright testified for the plaintiffs in this case. Both have brought a separate action against Coppin under Title VII of the Civil Rights Act of 1964 and other federal statutes. That suit is currently pending in this Court. *Kim, et al. v. Coppin State College, et al.*, Civil No. N–77–177.

Plaintiffs further assert that President Burnett revealed his opposition to the CFT by discriminating against members of the Union insofar as salary increases were concerned. The State Legislature had appropriated funds to provide flat salary increases of 7% for members of the Coppin faculty for the 1974–1975 academic year, and further sums were made available for discretionary merit increases. Plaintiffs contend that non-Union faculty members were preferred over Union faculty members in the awarding of these salary increases. The evidence presented does not support this contention. Many members of the CFT received substantial merit increases, while many non-Union faculty members received no more than the basic 7% raise. For example, Professor Camper, who was an officer of the Union, received a 16% increase in his salary, which was next to the highest amount given to any one of the nineteen professors listed on the exhibit relied upon by plaintiffs.[10] Assistant Professor Wollner, who was also an officer of the Union, received a 13% increase. Five of the professors on the list who were not members of the Union received no more than the basic 7% increase.

Plaintiffs particularly complain that each one of them received only a 7% increase. But the decision not to award the plaintiffs a merit increase for the 1974–1975 academic year was certainly a reasonable one. The teaching contracts of all three plaintiffs were being terminated, and it would have made little sense to provide incentive by way of merit increases for members of the faculty who would no longer be employed at the College at the end of the 1974–1975 academic year. By awarding the plaintiffs

no more than the basic 7% increase, Dr. Burnett made more money available for merit increases for those who would continue to be associated with the institution and who might need to be encouraged in the future.

■ On the record here, this Court concludes that plaintiffs have not met their initial burden because they have failed to prove that their constitutionally protected conduct was a substantial or motivating factor in the defendants' decision not to continue their employment. Even were this Court to disagree with the decisions made by President Burnett to discontinue the contracts of the three plaintiffs, it is not the function of a federal court to second-guess the decision of a school official on matters within his discretion which do not rise to the level of a constitutional deprivation. *Shaw v. Board of Trustees of Frederick Community College*, 549 F.2d 929 (4th Cir. 1976); *see Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 992 (1975). It is not the role of the federal courts to set aside decisions of school administrators which the Court may view as lacking in wisdom or compassion or because of mistake. *Wood, supra* 420 U.S. at 326, 95 S.Ct. 992; *Bishop, supra* at 350, 96 S.Ct. 2074. A non-tenured teacher at a public institution does not have the right to be insulated from review by superiors merely because he or she engages in constitutionally protected conduct. *Mt. Healthy City Board of Education v. Doyle, supra*, 429 U.S. at 286, 97 S.Ct. 568; *Hetrick v. Martin*, 480 F.2d 705, 709 (6th Cir. 1973); *Wojloh v. DeVito*, 506 F.2d 1399 (4th Cir. 1974).[11]

10. Plaintiffs' Exhibit No. 6 lists all full professors, associate professors, assistant professors and instructors employed at Coppin during the 1973–1974 and 1974–1975 academic years, together with the raises recommended by the Faculty Senate and the amounts actually received.

11. The *Wojloh* case involved an earlier suit brought in this Court by a non-tenured teacher

at Coppin who claimed that his contract had not been continued because of the exercise by him of his First Amendment rights. In granting summary judgment in favor of the defendants, this Court ruled that his discharge for refusing to follow a grading policy was not actionable under § 1983. The Fourth Circuit affirmed in a *per curiam* Opinion. 506 F.2d 1399.

## II

### The defendants' burden

Even were this Court to conclude that the plaintiffs had met their initial burden under the *Mt. Healthy* case, the record here supports a finding that the defendants have proven by a preponderance of the evidence that they would have reached the same decision as to the plaintiffs' re-employment even in the absence of the protected conduct. Much of the previous discussion likewise applies here. The contracts of the non-tenured plaintiffs were not renewed because of budgetary and other valid reasons, and assuming, *arguendo*, that constitutionally protected conduct on their part had been a motivating factor, the defendants would have reached the same decision in any event.

Plaintiffs Thomas and Dean had conflicts with their superiors which led to recommendations that their teaching contracts not be renewed. In *Pickering v. Board of Education, supra*, the Supreme Court, in upholding the First Amendment claim of a public school teacher, noted that no question was presented in that case of maintaining either discipline by immediate superiors or harmony among co-workers. 391 U.S. at 570, 88 S.Ct. 1731. In *Chitwood v. Feaster*, 468 F.2d 359 (4th Cir. 1972), Chief Judge Haynsworth drew a similar distinction between "protected" and "unprotected" speech. The Court there held that affidavits which asserted participation in protest meetings and the making of public statements critical of the college and its officials indicated claims sufficient to avoid summary judgment. But, the Court referred to other affidavits in that case, and pointed out what it considered to be unprotected speech different from that which would form the basis of a claim under § 1983. At page 360–361, Chief Judge Haynsworth said the following:

Some of the affidavits refer to what seems to be bickering and running disputes with the department heads. We do not intend to suggest that that kind of speech is protected by the First Amendment in the sense that it may not be considered in connection with the termination of the employment relationship. A college has a right to expect a teacher to follow instructions and to work cooperatively and harmoniously with the head of the department. If one cannot or does not, if one undertakes to seize the authority and prerogatives of the department head, he does not immunize himself against loss of his position simply because his noncooperation and aggressive conduct are verbalized.

Young, impatient and without much experience as a college instructor, plaintiff Dean had a number of disputes with Dean Dedmond and felt that she was not being treated fairly. Because of her aggressive and uncooperative attitude, plaintiff Dean was a logical candidate for non-renewal when it became necessary for President Burnett to reduce the size of the Coppin faculty in the Spring of 1974.

Plaintiff Thomas likewise clashed with his superior, Mr. Luke Shaw, Chairman of the Art Department, who found Thomas to be uncooperative and generally deficient in the performance of his duties.[12] Moreover, plaintiff Thomas is barred from recovery for another reason. After consulting with his attorney, plaintiff Thomas agreed that his employment would be terminated on June 30, 1975 if the College withdrew its 1974 notice of termination and allowed him to stay for another year. By entering into this settlement agreement

---

12. Mr. Shaw was not sure of the date when he wrote the report which detailed his criticisms of plaintiff Thomas and which was admitted in evidence as defendants' Exhibit No. 33. However, it is not material whether the report was written before or after February 28, 1974 when Thomas was first notified that his contract would not be renewed. The evidence discloses that Mr. Shaw had held these views for some time and had communicated them to his superiors before February 28, 1974.

**334**

which was fully carried out by Coppin, plaintiff Thomas has waived his right to relief in this action.[13]

Plaintiff Cherry's problem was somewhat different from that of the other two. Coppin had made a mistake in hiring him in the first instance. His principal background had been in speech pathology, and he was not equipped to teach either in a graduate or an undergraduate program in the Special Education Department. Thus, he was included in the Spring of 1974 in a list of those to be terminated because of the institution's financial problems. When Cherry's many friends later prevailed upon the Chairman of the Department to reconsider his decision, it was too late. By the Spring of 1975, a decision to retain plaintiff Cherry would have required the termination of some other member of the faculty for the 1975–1976 year, and timely notice was not possible at that late date. Even after Cherry's termination effective June 30, 1975, attempts were made by President Burnett to find another position for him by the use of federal funds. After investigating the matter, Dr. Ruvin, then acting Chairman of the Department, advised President Burnett by letter dated August 15, 1975 that plaintiff Cherry's qualifications were not suitable for a position in these new federal programs.

 On the record here, this Court concludes that the defendants have shown by a preponderance of the evidence that their decisions not to rehire each of the plaintiffs would have been made in any event, even assuming, *arguendo*, that protected conduct played a part in these decisions.

### Conclusion

For the reasons stated, judgment is hereby entered in favor of the defendants, with costs. This Court's findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure are embodied in this Opinion, whether or not expressly so characterized.

---

**13.** Threatening suit against Coppin, his attorney's letter of August 4, 1974 claimed, *inter alia*, that Thomas (who is black) had been subjected to "blatant" racial discrimination by President Burnett (who is also black). Curiously, Dr. Bright (who is white) and Dr. Kim (of Korean ancestry) have charged President Burnett with discrimination against them because they are not black.