Bertell OLLMAN, Plaintiff,

v.

John S. TOLL, Board of Regents of the University of Maryland and Wilson H. Elkins, Defendants.

Civ. No. H–78–1402.

United States District Court, D. Maryland.

July 27, 1981.

David Bonderman, Richard S. Ewing, Andrew Butz and Arnold & Porter, Washington, D. C., and Andrew Jay Graham and Kramon & Graham, P. A., Baltimore, Md., for plaintiff.

Paul F. Strain, William A. Kahn, Diana G. Motz and Susan B. Blum, Asst. Attys. Gen., Baltimore, Md., for defendants.

Mary E. Kurz, Asst. Atty. Gen., Baltimore, Md., for defendant Toll.

ALEXANDER HARVEY, II, District Judge:

Bertell Ollman, the plaintiff in this civil action, is a Marxist. He has here sued various representatives of the University of Maryland under 42 U.S.C. § 1983,[1] claiming that in 1978 he was rejected for the position of Professor and Chairman of the Department of Government and Politics at the College Park campus of the University because of his political beliefs and associations. Named as defendants are John S. Toll, President of the University of Maryland, Wilson H. Elkins, the past President of the University, and the University's Board of Regents. As relief, plaintiff seeks an injunction which would require the University to appoint him as Professor and Chairman of the Department in question, back pay, compensatory and punitive damages, attorneys' fees and other relief.

In opposing the plaintiff's claims for relief, the defendants assert that plaintiff's political beliefs were not a substantial or motivating factor in the decision of the President of the University not to appoint him as Chairman of one of its major departments and as a Professor with tenure. Defendants further contend that if plaintiff's Marxism were found to be a substantial factor in President Toll's rejection of defendant for the position, the President would have reached the same decision as to plaintiff's employment at the University even in the absence of plaintiff's political beliefs. It is further contended that defendants Elkins and the Board of Regents were not responsible for any violation of plaintiff's constitutional rights because the ultimate decision was made by President Toll on July 20, 1978 and not by the other named defendants.

Pretrial proceedings in this case have been extensive. Following several pretrial conferences and the entry of a Pretrial Order with supplements, the case came on for trial before the Court sitting without a jury. The trial record is a massive one. Extensive testimony was heard during the four-week trial and over 300 exhibits were entered into evidence. Much of the testimony was conflicting, and in deciding the issues of fact, due regard has been had by the Court to the credibility of the witnesses and the weight their testimony deserves. Findings of fact and conclusions of law, pursuant to Rule 52(a), F.R.Civ.P., are contained in this opinion, whether or not expressly so stated.

---

1. Various other claims of the plaintiff against the defendants were dismissed before trial.

## I
### The background facts

The University of Maryland is a large, public institution, with branches in various parts of the State and even overseas. At any one time, there are approximately 50,-000 students at the College Park campus of the University. The total faculty numbers some 4,000 persons, with some 2500 faculty members located at College Park.

The Department of Government and Politics at the College Park campus is one of the larger departments of the University.[2] In September 1977, Professor Davis P. Bobrow, who had come to Maryland in 1974, resigned as Chairman of the Department. In accordance with University procedures, a Search Committee was appointed to locate a successor for this important position.

After considering a list of approximately 100 persons during the final three months of 1977, the Search Committee by early January of 1978 had not come up with a likely candidate to recommend for the position. Dr. Bertell Ollman, the plaintiff, was at the time an Associate Professor of the Department of Politics at New York University (hereinafter "N.Y.U.").[3] His name was not on the original lengthy list which the Search Committee had considered. However, in early January, three members of the Committee suggested plaintiff's name for the position, and the Committee ultimately recommended him and one other candidate for the position. The other candidate was Dr. Robert T. Holt, who is a Professor of the Department of Political Science at the University of Minnesota and presently Chairman of that Department. Both Dr. Holt and Dr. Ollman came to the College Park campus on several occasions and were interviewed.

Under University procedures, a Search Committee is required to report its recommendations for filling a position of this sort to the Provost of the particular Division of the faculty. The Department of Govern-

ment and Politics was within the Division of Behavioral and Social Sciences, and the Provost was Dr. Murray Lee Polakoff, who, in February 1978, had been with the University for some seven months. Following receipt of the Search Committee's recommendation, the Provost was in turn required to make his recommendation to the Chancellor for Academic Affairs, in this instance, Dr. Robert L. Gluckstern. Dr. Gluckstern in turn would forward his recommendation for the position to the President of the University. Under the By-laws of the Board of Regents, it was the President who had the final authority to appoint a person Chairman of a Department. However, it was the practice that all recommendations for faculty appointments to be made by the President would first come to the Vice President of Academic Affairs for review. In the spring of 1978, Dr. R. Lee Hornbake had occupied this post for some eighteen years. He regularly reviewed recommendations of this sort from the Chancellor, and in turn, made recommendations to the President before final action was taken.

In the spring of 1978, Dr. Wilson H. Elkins had been President of the University of Maryland for some twenty-four years. He had previously announced his retirement effective June 30, 1978, and Dr. John S. Toll had been selected to replace him as President, commencing on July 1, 1978. Dr. Toll had been President of the State University of New York at Stony Brook, New York, for some thirteen years. During the spring of 1978, he was finishing up his term at the Stony Brook campus and was, of course, not then responsible for affairs of the University of Maryland.

Acting with some urgency between early January and late February, 1978, the Search Committee for the Department of Government and Politics recommended both Dr. Holt and Dr. Ollman for appointment as Chairman of the Department. In a meeting with Provost Polakoff, the same mem-

---

2. At the time of the matters in suit, there were some forty-one faculty members within the Department of Government and Politics.

3. Dr. Ollman did not become a full Professor at New York University until May of 1980.

bers of the Committee who had initially suggested plaintiff's name urged that he be selected for the position. The Provost agreed and, after reviewing the matter with the Chancellor and receiving his concurrence, telephoned plaintiff on March 3, 1978 and offered the post to him, provided that the President approved the appointment. When he had originally reviewed the qualifications of the candidates, Chancellor Gluckstern had rated Dr. Holt over Dr. Ollman, but he was later persuaded by the Provost that the position should be offered to Dr. Ollman.

More than six weeks then elapsed before Chancellor Gluckstern forwarded his recommendation to Dr. Hornbake and Dr. Elkins. Various steps were taken during that period to have the files on the recommended appointment put in proper form for submission to the President. Meanwhile, on April 18, 1978, an article appeared in *The Diamondback*, the campus newspaper, reporting that plaintiff, a Marxist, was being recommended for appointment as Chairman of the Department of Government and Politics. This first press report led in the following weeks to a veritable storm of publicity relating to the appointment. Articles appeared in Baltimore and Washington newspapers as well as in *The Diamondback*, discussing the fact that a Marxist was being considered for this important position. The publicity evoked considerable comment by both public officials and private citizens, and the Ollman matter quite rapidly became a cause célèbre. The Governor, legislators, alumni, members of the faculty, members of the Board of Regents and private citizens raised questions concerning the propriety of the proposed appointment. Members of the faculty and other supporters of plaintiff viewed the Ollman affair as a question of academic freedom and urged President Elkins to promptly appoint plaintiff to the position in question. Suit was threatened if the appointment was not made at once. Some of those who opposed the appointment based their objections on plaintiff's qualifications to be Chairman of this important department at the University. Others took the flat position that a Marxist should not occupy the post.

When the formal papers eventually reached Dr. Hornbake and were reviewed by him, he was disturbed by certain irregularities which he concluded had occurred in the search procedures. The more he looked into the matter, the more concerns he had. After further study of the file and discussions with various faculty members, Dr. Hornbake eventually recommended to President Elkins that plaintiff not be appointed. Meanwhile, the publicity and controversy over the appointment continued. Since late April, President Elkins had been aware that if the appointment was rejected by him, a suit in federal court would be filed against him by Dr. Ollman.

By this time it was late May of 1978, a very busy time of the year for a University President. To complicate matters even further, President Elkins was scheduled to retire effective June 30. Fearing that if he went along with the recommendation of Dr. Hornbake he would be involved in lengthy litigation which would come to trial after his retirement, President Elkins decided to seek the help of the Board of Regents. At a meeting of the Board of Regents on June 16, 1978, he stated that he was bringing the matter to the Board because of unusual circumstances surrounding the appointment. Dr. Elkins informed the Board that he was not inclined to support the appointment but that he was asking the Board itself to make the final decision. After some discussion, the Board concluded that it did not have sufficient information on the matter at that time. The Board decided to meet with counsel, secure counsel's advice and then decide on its further course of action. Before the Board would legally have been able to act on the appointment, it would have been necessary to change its By-laws, which provided that only the President had the authority to approve or disapprove an appointment of this sort. Between June 16 and June 30, 1978, which was the last day that President Elkins was in office, the Board had the matter under study, receiving advice from an Assistant Attorney General of the State. At a meet-

ing of the Board held on June 21, the Board formally requested President Elkins to give the Board a written report on the matter before he left office. It was decided that upon receipt of this report, the Board would then consider what further action it should take.

President Elkins left office without having acted on the appointment. On June 30, as requested, he submitted to the Board his written report, together with pertinent materials from Chancellor Gluckstern, Provost Polakoff and the Search Committee. On July 1, 1978, defendant Toll assumed his new duties as President of the university and was confronted immediately with the Ollman matter. After considering the posture of the appointment at that time, he decided that he alone should make the final decision. He so advised the Board, which concurred in that decision since it was in keeping with the existing By-laws. At a later meeting held on July 18, the Board formally reaffirmed the President's authority to act on the Ollman appointment.

After discussing the matter with Dr. Hornbake and reviewing all documents in University files, President Toll decided that he would not rely merely on information in the files but would himself make an independent investigation of the qualifications of the plaintiff to be Chairman of the Department of Government and Politics. He held an open meeting with members of the Department on July 11, 1978, soliciting their views.[4] Various Professors and other faculty members presented their comments both *pro* and *con* concerning the appointment of plaintiff to this position. Most favored the appointment but one-third of those present opposed it, including two former Chairmen of the Department and the Acting Chairman. On his own, President Toll had prepared a list of political science experts and others for consultation, and in early July, President Toll personally communicated with these individuals. Most of the persons on this so-called "referee list" were political scientists, and many were persons known and respected by President

Toll. Some of the comments were favorable to Dr. Ollman but most were unfavorable.

Finally, on July 20, 1978, President Toll announced his decision. In a prepared statement, he said that after appropriate consultation and review, he had decided not to approve the appointment of plaintiff for the position of Professor and Chairman of the Department of Government and Politics at the University of Maryland at College Park. President Toll stated that his decision had been based on his own evaluation of whether or not the proposed candidate was the best qualified person for the position. His decision was announced at a special meeting of the Board of Regents held on the morning of July 20, 1978.

On August 1, 1978, this civil action was filed. Plaintiff contends that defendant Toll's stated reason for disapproving the appointment was a mere pretext and that defendant Toll was actually motivated to reject plaintiff because of his Marxist beliefs. With reference to his claim against President Elkins, plaintiff asserts that this defendant refused to decide whether or not to confirm plaintiff's appointment, because of plaintiff's Marxism, and that such refusal amounted to a violation of plaintiff's rights under § 1983. As to the Board of Regents, it is also contended that this defendant refused to take action to confirm plaintiff's appointment because of legally impermissible reasons.

## II

### *The applicable legal principles*

■ It is well established that a state university may not refuse to employ a prospective member of its faculty if the decision is made by reason of the exercise by the applicant of constitutionally protected First Amendment rights. *Cherry v. Burnett*, 444 F.Supp. 324 (D.Md.1977); *see Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Marxist or Communist beliefs, like other political beliefs, are protected under the First and

---

**4.** Notes of this meeting were kept by both President Toll and Dr. Hornbake.

Fourteenth Amendments, and such beliefs or one's association with others holding them is protected activity for which a state may not impose civil disabilities such as exclusion from employment by a state university. *Cooper v. Ross*, 472 F.Supp. 802 (E.D.Ark.1979).

■ In *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Supreme Court discussed the principles applicable in a suit brought under § 1983 by a teacher seeking reinstatement by a state educational institution. The burden in a case of this sort is initially placed upon the plaintiff to prove that his beliefs were constitutionally protected and that such beliefs were a substantial or motivating factor in the decision of the state institution not to hire him. *Id.* at 287, 97 S.Ct. at 576. Once the plaintiff in a case like this one has carried his initial burden, the Court must go on to determine whether the defendants have shown by a preponderance of the evidence that they would have reached the same decision as to the plaintiff's employment even in the absence of the protected beliefs. *Id.* at 287, 97 S.Ct. at 376; *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 416, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979); *Cherry v. Burnett, supra* at 326.

■ It is equally well established that, in a case of this sort, the fact finder must bear in mind that it is not the function of a federal court to second guess the decision of an official of a state university on matters within his discretion which do not rise to the level of a constitutional deprivation. *Shaw v. Board of Trustees of Frederick Community College*, 549 F.2d 929, 932 (4th Cir. 1976); *Cherry v. Burnett, supra* at 332. No reason at all need be given for the refusal of a state university to hire a member of the faculty, and in fact, the state institution need have no reason at all so long as the decision is not based on a constitutionally impermissible reason. *Franklin v. Atkins*, 562 F.2d 1188, 1190 (10th Cir. 1977). A federal court should not set aside the decision of a school administrator which the court may view as lacking in wisdom or

compassion or because of mistake. *Cherry v. Burnett, supra* at 332. As the Supreme Court emphasized in *Mt. Healthy*, an applicant for a position at a public institution does not have the right to prevent his prospective employer from assessing his record and reaching a decision not to employ on the basis of that record merely because he has beliefs or associations which are constitutionally protected. 429 U.S. at 286, 97 S.Ct. at 575.

In this case, the Court is called upon first to determine whether the plaintiff has satisfied his initial burden of proving that his beliefs were constitutionally protected and that these beliefs were a substantial or motivating factor in the decision of one or more of the defendants not to hire him as Professor and Chairman of the Department of Government and Politics at the University of Maryland. Secondly, if plaintiff has satisfied his initial burden, the Court must determine whether the defendants have shown by a preponderance of the evidence that they would have made the same decision even in the absence of the constitutionally protected beliefs of the plaintiff. Thirdly, and related to each of these questions, is whether the reasons given by one or more of the defendants for refusing to hire the plaintiff were pretextual.

### III

*The claim against defendant Toll*

(a) *Plaintiff's burden*

■ Quite clearly, plaintiff has satisfied the first part of the burden placed upon him in a case of this sort. Dr. Ollman was a Marxist and was known for professing those political beliefs. Whether or not plaintiff's Marxist beliefs are popular ones and whether or not they have the approval of other citizens of this country, they are entitled to the full protection of the First Amendment. No more direct assault on academic freedom can be imagined than for school authorities to refuse to hire a teacher because of his or her political, philosophical or ideological beliefs. *See Board of Regents v. Roth*, 408 U.S. 564, 581, 92 S.Ct.

2701, 2711, 33 L.Ed.2d 548 (1972) (Mr. Justice Douglas dissenting). Thus, an official of a state university may not restrict speech or association, even by the subtle or indirect coercion of refusal to hire, simply because that official finds the views expressed by any group or individual to be abhorrent. *See Healy v. James*, 408 U.S. 169, 187–88, 92 S.Ct. 2338, 2349, 33 L.Ed.2d 266 (1972); *Franklin v. Atkins*, 409 F.Supp. 439, 445 (D.Colo.1976), *aff'd*, 562 F.2d 1188 (10th Cir. 1977).

■ The second portion of plaintiff's burden is a much more difficult one.[5] Plaintiff must go beyond proving that his Marxism was a factor in his rejection. To be entitled to the relief he seeks, plaintiff in this case has the burden of showing that his beliefs or associations were a substantial or motivating factor in the decision of one or more of the defendants that he would not be hired at the University of Maryland. It is this issue to which the great bulk of the evidence in this case has been directed.

Although plaintiff has contended that President Elkins and the Board of Regents played a part in rejecting him for employment at the University, it is abundantly clear that President Toll and only President Toll made the final decision which is being challenged. Moreover, under the By-laws of the Board of Regents, only President Toll was legally authorized to make the decision after July 1, 1978, and no decision either way was made before that date. Therefore, it is the reasons given by President Toll for acting as he did which must be examined critically and in detail before the Court can determine whether plaintiff has met his burden of proving that his Marxism was a substantial or motivating factor in his rejection.

(b) *President Toll's review of the matter*

Most of the voluminous evidence in the case related to events that occurred before President Toll assumed his duties at the University on July 1, 1978. These facts are of course relevant, because many of the events occurring in the first six months of 1978 were later brought to the attention of President Toll when he assumed office on July 1, 1978 and reviewed extensive University files relating to the matter. But, much more significant are the critical events that occurred between July 1, when President Toll took office, and July 20, when he announced that he would not appoint plaintiff to the position in question. A detailed examination of these events in particular is necessary for this Court to determine whether plaintiff has met his burden in this case.

President Toll had first heard of the Ollman matter while he was still at Stony Brook. A letter dated March 23, 1978 and marked "PERSONAL AND CONFIDENTIAL" was addressed to and received by him. Although unsigned, the letter was written on stationery of the University of Maryland's Department of Government and Politics, and purported to be submitted on behalf of a group of faculty of the Department. Attached to the letter was the Curriculum Vitae of the plaintiff. This letter informed defendant Toll that there was a vacancy in the Department and that certain persons were trying to bring in the plaintiff and have his appointment confirmed before defendant arrived on the scene. It was suggested in the letter that the appointment might slip through in the shuffle during the change of presidency and be made irrevocable before defendant Toll took office.[6]

In a confidential memorandum dated April 5, 1978, defendant Toll forwarded the letter on to Chancellor Gluckstern. In this memorandum, defendant Toll said the following:

"If the statement by these faculty members is correct, and a new Depart-

---

**5.** In *Franklin v. Atkins, supra*, the Tenth Circuit described the *Mt. Healthy* burdens as "substantial" ones. 562 F.2d at 1191.

**6.** The evidence produced at trial indicates that many of the statements made in this letter were incorrect. The letter is relevant merely because it informed defendant Toll for the first time that the Ollman matter existed and that there was a split in the Department concerning the appointment.

ment Chairman is being selected without giving the tenured faculty of the Department a chance to vote, then there would appear to be a lapse in proper procedure. I have no further information than the information given in this letter, and I am therefore forwarding it to you to act on in accordance with your own judgment and discretion."

By letter dated April 20, 1978, Chancellor Gluckstern replied to Dr. Toll, noting that Dr. Ollman was a Marxist scholar and further stating:

"Ever since it became evident that Dr. Ollman was a leading candidate for the appointment there has been agitation by an unidentified minority of the Government and Politics faculty. Their displeasure is manifest not only in the letter you have received but also in approaches to administrative officers at College Park, to President Elkins and members of the Board of Regents, through private citizens to the Governor's office, and to the press.

"I expect to forward to President Elkins within the next week my recommendation for the appointment of Dr. Ollman. For your information, I am enclosing herewith copies of some correspondence dealing with the search procedure. I believe that these letters respond to most of the erroneous charges contained in the anonymous letter."

After receiving that letter, Dr. Toll had little contact with the Ollman matter until he came to Maryland to assume the office of President. Indeed, he believed that President Elkins would have made the decision by the time that he (Toll) assumed office. Moreover, defendant Toll had told the Chairman of the Board of Regents that he would fully support any decision on the matter made by President Elkins.

Although Dr. Toll's term of office did not commence until July 1, 1978, he arrived at the University on June 30 and met with the Vice Presidents that Friday afternoon so that he might have a "running start." That meeting was mainly concerned with various other matters, but procedural aspects of the Ollman appointment were also discussed. By that time, President Toll had learned that the decision in the Ollman appointment had not been made by retiring President Elkins but that the matter was under discussion by the Board of Regents. Before deciding what should be done, the Board had requested President Elkins to prepare a full written report for the Board's consideration. That report, with voluminous attachments, was submitted to the Board on June 30, the last day that Dr. Elkins held office. A copy of the report was given to defendant Toll when he arrived on the campus that afternoon.

Defendant Toll knew that the By-laws of the University provided that the President should make the final decision on appointments of chairmen of departments. Reflecting on the matter, he decided that it would be a mistake to alter that authority and begin his administration with a diminution in the responsibility of the President. In that Friday afternoon meeting, defendant Toll told the Vice Presidents of the University that he would ask the Board to reaffirm the authority of the President to make the decision on the Ollman appointment. None of the Vice Presidents objected to the incoming President's views concerning this subject. Dr. Toll's authority to make the decision pursuant to the By-laws was later formally reaffirmed at the Board meeting held on July 18, 1978.

After assuming office on Saturday, July 1, and dealing with various University matters that day,[7] President Toll flew back to his summer home on Long Island that night. He took with him the thick packet of materials prepared by President Elkins for the Board relating to the Ollman mat-

7. In his meeting with Chancellor Gluckstern that day, President Toll also mentioned to the Chancellor his feeling that the President's authority under the By-laws should be reaffirmed and that he, the new President, should make the decision concerning the Ollman appointment.

ter.[8] In the report he had prepared for the Board of Regents, President Elkins described in detail the steps he had taken in connection with the Ollman matter since he had first been officially advised by Chancellor Gluckstern that the recommendation would be forthcoming. Following his review of materials received from the Chancellor, President Elkins had concluded that the procedures followed in arriving at a decision to offer plaintiff the position lacked credibility. It was his opinion that Dr. Ollman's academic accomplishments would not bring academic stature to the Department of Government and Politics, that Dr. Ollman lacked administrative experience necessary for directing a large department such as this one, and that Dr. Ollman's lack of diversification in the field of political science was not conducive to effective leadership in a department which was marked with dissension and the absence of intellectual harmony. For these reasons, President Elkins had concluded that plaintiff's qualifications to be Chairman of the Department were not sufficiently strong to justify his appointment. He so stated in his report to the Board of Regents, which was included in the papers turned over to President Toll.

Over the long Fourth of July weekend following assumption of his new duties, President Toll for the first time reviewed in detail all documents in the file pertaining to the recommended appointment. At the outset, he was struck by apparent irregularities in the search procedures. An offer[9] to plaintiff had been made before the search process had been completed. One of the promising candidates, Dr. Charles F. Cnudde, who was Chairman of the Department of Politics at Michigan State University, was actually visiting the Maryland campus after a decision had been made to offer the position to plaintiff.

In particular, President Toll noted a misleading statement contained in Dr. Polakoff's letter of April 7, 1978 to Chancellor Gluckstern, recommending Dr. Ollman for the position. That letter indicated that by January 1978, the list of candidates for the position had been reduced from over one hundred names to five, that these five candidates were then invited to the University for interviews, that the two highest candidates (who were Ollman and Holt) were then invited to return for further discussions and that from this "thorough" search process, Dr. Ollman evolved as the leading candidate. Since Dr. Cnudde came to the campus in early March after a decision had been reached to make an offer to plaintiff, Dr. Polakoff's statement concerning the thoroughness of the search process raised questions in President Toll's mind.

In the course of President Toll's further review of these materials, other concerns arose. The Search Committee had been given a specific charge which outlined the qualifications for individuals to be recommended for the position in question. In its entirety, the charge was as follows:

"CHARGE TO GOVERNMENT AND POLITICS SEARCH COMMITTEE

"A nationwide search for the Chair of Government and Politics at the University of Maryland. Suggested qualifications: Outstanding scholarly reputation, highly energetic, capable administrator, interested in interdisciplinary and applied programs and research. Experienced in obtaining research grants."

Professor Toll concluded that this was a reasonable statement of the necessary qualifications of candidates for the position, and used the charge itself in judging the qualifi-

8. The covering letter, dated June 30, 1978, was addressed to Dr. B. Herbert Brown, Chairman, and to the other members of the Board of Regents. Packet I was a "Chronological Account by President Wilson H. Elkins." Packet II was the "Recommendation by Chancellor Robert L. Gluckstern, April 19, 1978, and material enclosed with the recommendation."

Packet III was a "Letter of Wilson H. Elkins, May 18, 1978 to Chancellor Robert L. Gluckstern and Chancellor Gluckstern's reply, June 7, 1978, with enclosures."

9. The offer was conditional and was subject to the final approval of the President of the University.

cations of plaintiff. Included in the file before him were letters to Chancellor Gluckstern from Dr. Martin C. McGuire, Chairman of the Search Committee, recommending both Professor Robert T. Holt and plaintiff for the position. Dr. McGuire's letter of February 21, 1978, which attached a copy of Professor Holt's Curriculum Vitae (hereinafter "C.V."), stated that Professor Holt had been "enthusiastically" endorsed by the Search Committee as a candidate for Chairman of the Department of Government and Politics. Dr. McGuire stated that Professor Holt had "a superb record as a scholar," "a proven track record as an administrator" and that he would "be most adept" at bringing research grant money into the Department. Dr. McGuire's shorter letter of February 24, 1978, which attached a copy of plaintiff's C.V., stated that plaintiff had been "warmly" endorsed by the Committee as a candidate for the position. Although stating that plaintiff was "a world renowned student of Marx" who had "captured the imagination" of the Search Committee, Dr. McGuire made no mention of any administrative experience of plaintiff nor of any experience he had in obtaining research grants.

When he read these letters and the attached C.V.'s, President Toll concluded that Holt appeared to be a much stronger candidate than Ollman.[10] He wondered why an offer had not been made to Holt. Dr. Holt had been promoted in 1964 to a full professorship in the Department of Political Science at the University of Minnesota, which, according to Dr. McGuire's letter, was one of the top six political science departments in the nation.[11] Unlike plaintiff, Holt had been on the original list of 100 names that had been compiled by the Search Committee. Holt's C.V. indicated that he was a top flight scholar, that he had published extensively in recognized journals and that he had considerable administrative experience.[12] Furthermore, Holt had experience in research development. President Toll felt that it was important for the University of Maryland to have as Chairman of the Department of Government and Politics an individual who would know how to obtain research grants and develop graduate research programs. Since the Department at Maryland was a large one and since the University occupied a unique location so close to the seat of the national government in Washington, D. C., President Toll believed that one of the important missions of the Department was to develop strong graduate research programs.[13]

President Toll also noted that Professor Holt had, between 1976 and 1978, been a member of the Council of American Political Science Association (APSA), the leading professional association for political scientists in the nation. In President Toll's mind, election to such a position was a recognition of national achievement by a professor's colleagues and particularly by those interested in research in political science.[14] Recognizing that Professor Holt was a leading candidate for the position, the Search Committee had speeded up its procedures since Holt had to know before mid-March whether the offer would be made to him. Although the deadline was that of Holt, the Committee, in acting with

10. Defendant Toll also read Dr. Cnudde's C.V. and concluded that Cnudde was likewise a stronger candidate than Ollman. Cnudde was Chairman of the Political Science Department at Michigan State University, a major state institution.

11. Whether or not the University of Minnesota was actually ranked that high at the time, it clearly had a substantial national ranking, certainly far ahead of N.Y.U. and the University of Maryland.

12. Chancellor Gluckstern had also rated Holt over Ollman, but had been persuaded by Provost Polakoff to recommend Ollman for the position. When he interviewed Holt on February 23, Dr. Gluckstern in his notes described Holt as "astute, personable, will have very high expectations, first class." Moreover, it was Dr. Gluckstern's judgment that Holt's scholarship was somewhat stronger than that of Ollman.

13. President Toll testified that the University of Maryland is now one of the major research universities in the country in terms of federal research dollars.

14. Plaintiff had run for office in APSA in 1976, but had been defeated.

urgency, had recommended Ollman to the Provost.

During his long weekend review of these files, President Toll also studied plaintiff's C.V. and other materials submitted in support of the Chancellor's recommendation of plaintiff for the appointment. Unlike the other leading candidates, plaintiff was not at the time a full Professor but merely an Associate Professor at N.Y.U. President Toll noted that plaintiff's principal contribution as a scholar was his book entitled *Alienation: Marx's Conception of Man in Capitalist Society*, published in 1971. This was recognized as plaintiff's major work, but it was apparently based in substantial part on his 1967 doctoral dissertation.[15] Information contained in the files before him did not indicate to President Toll that plaintiff possessed the administrative experience to be Chairman of a large Department such as this one. Many of the letters of recommendation contained statements to the effect that the author of the letter had little knowledge of plaintiff's experience in this regard.

Although his impressions of plaintiff's qualifications for the position and of those of other candidates were merely tentative ones, President Toll concluded, before returning to the Maryland campus on July 5, that it would be necessary for him to investigate the matter further. He recognized that both the Provost and the Chancellor had recommended the appointment. But President Toll had serious doubts whether his approval of the Chancellor's recommendation would result in the best appointment that could reasonably be made, and he had enough concerns that he felt he should check further. He decided to secure additional expert opinions on plaintiff's qualifications, both from within the University and from outside. He also decided that he himself would read plaintiff's publications and use the knowledge gained thereby as background for his discussions with the experts with whom he would consult.

President Toll's approach to this appointment was consistent with the practice he had followed in making appointments at Stony Brook as to which he had had concerns.[16] On those occasions, he had solicited views from knowledgeable persons outside the University. Moreover, he himself had often been called by representatives of other universities and asked for his appraisal of the qualifications of candidates who had applied for positions at such institutions.

On Thursday, July 6, 1978, President Toll went to St. Louis to attend a meeting called by the Association of American Universities. While there, he continued his investigation of plaintiff's qualifications. President Toll telephoned or spoke in person to five different individuals about plaintiff before he left St. Louis on Saturday, July 8. Most of the comments he received were unfavorable.

One of the significant evaluations obtained by President Toll in St. Louis was that given him by Professor John Wahlke. Dr. Wahlke was a political scientist with a national reputation and was President of the American Political Science Association at the time he was called by defendant Toll.[17] President Toll was personally acquainted with Dr. Wahlke, who had previously been a Professor of Political Science at Stony Brook and whose advice had previously been solicited by Toll concerning appointments of political scientists at that New York institution. Dr. Wahlke, who was then at the University of Iowa, told Presi-

---

**15.** Plaintiff's proof included the testimony of Professors Berlin, Rubel and Lukes. Each of these political scientists indicated that plaintiff's book *Alienation* was based substantially on his doctoral thesis.

**16.** In a Memorandum dated June 29, 1972 to all faculty members at Stony Brook discussing standards for academic promotions, President Toll had stated that although he gave careful consideration to the judgment of members of the faculty and administrative officers, appraisals would also be solicited from other qualified academic persons both on and off campus, "which I think will be helpful to me."

**17.** Dr. Wahlke testified at the trial. He is presently Professor and Chairman of the Department of Political Science at the University of Arizona.

dent Toll that he knew of plaintiff and his writings in general, that he had not read all of plaintiff's works but that he had read a few things which were "fairly polemical." Terming the recommendation of plaintiff for the position in question "a mystifying choice," Dr. Wahlke told President Toll that plaintiff was not a nationally known scholar of real stature and that he did not believe that plaintiff would even be considered for a full professorship in his department at Iowa. In his testimony at the trial, Dr. Wahlke corroborated President Toll's version of this telephone conversation.

Also of significance to President Toll were the comments of Dr. William Havard, who was then Chairman of the Department of Political Science at Vanderbilt University and an editor of a scholarly political science journal. President Toll did not himself know Dr. Havard, who had been recommended by Chancellor Alexander Heard, then Chief Executive Officer at Vanderbilt University.[18] Chancellor Heard told President Toll that he could count on Dr. Havard's honest and expert advice.

At President Toll's request, Dr. Havard reviewed publications of plaintiff over a period of several days. When he called back, Dr. Havard recommended strongly against the appointment, telling President Toll that he would definitely not want plaintiff on his own faculty. According to Dr. Havard, plaintiff was not a leading scholar, and Dr. Havard did not regard him as objective or capable. Dr. Havard, although active in political science circles, had never heard of the publications of Bertell Ollman until the recent notoriety that was the result of this particular controversy at the University of Maryland.

Another political scientist who was Chairman of the Department of Political Science at a respected public university, termed the

Ollman appointment "silly" and "foolish" and one which could not be justified because it did not take advantage of the University of Maryland's location near Washington, D. C. It was this Professor's view that the orientation of the members of the faculty at Maryland behind the appointment was not towards scholarship "but toward social change." After reviewing plaintiff's scholarly publications, this Professor called President Toll back four days later to say that he had read much of plaintiff's work and that he thought that plaintiff could merit tenure but that he would definitely recommend against the Chairmanship at Maryland for plaintiff.[19]

When he returned to Long Island for the weekend of July 8–9, President Toll continued his independent check of plaintiff's qualifications, telephoning and soliciting the views of various members of the faculty at Stony Brook. Professor Frank Myers, who was then about to become Chairman of the Department of Political Science at Stony Brook, stated that although plaintiff was one of the better scholars on Marxist political theory, he, Myers, did not believe that plaintiff was in the same league as the leading political theorists in the country. Professor Myers was doubtful that plaintiff would be considered for a full professorship at Stony Brook, but stated that he did not know whether this was as much a criticism of Dr. Ollman as of his own department where he believed Ollman would not fit in well. Myers had no idea of Ollman's ability as an administrator.

Professor Joseph Tannenhaus was also a member of the Department of Political Science at Stony Brook and had formerly been its Chairman.[20] He told President Toll that plaintiff was not a major figure in political science because he worked in a field which

18. Chancellor Heard was also at the St. Louis meeting. President Toll considered him to be one of the truly distinguished university leaders in this country.

19. Two other political scientists were also consulted by President Toll during the St. Louis meeting. One termed plaintiff's *Alienation* a "highly competent book," but urged that his

administrative abilities be checked. The other gave a generally unfavorable opinion of plaintiff which was based on what this Professor had heard from other political scientists.

20. Professor Tannenhaus was consulted either the weekend of July 8–9 or the weekend of July 15–16.

had not attracted many of the best political scientists and which was "not a main line field." Professor Tannenhaus had not heard of plaintiff until one year previously, and he was surprised when the University of Maryland approached plaintiff about the Chairmanship.[21]

On July 10, President Toll returned to the Maryland campus. On the evening of July 11, a previously scheduled meeting was held with the full time faculty members of the Department of Government and Politics so that President Toll might personally hear their views concerning the controversial Ollman appointment. Also present at the meeting were Chancellor Gluckstern, Provost Polakoff, Dr. Hornbake and other administrative officials of the University.[22] The meeting lasted for some one to two hours, and some seventeen members of the Department's faculty attended and freely presented their views concerning the qualifications of plaintiff for the position in question and the procedures employed for recommending him.

What became abundantly clear during this meeting was that the faculty of the Department had sharply differing views both as to the procedural aspects of the selection of plaintiff and as to the substantive qualifications of plaintiff to be the Department's Chairman. That there was serious dissension and a sharp split in the Department was nothing new and was well known in University circles. When Dr. Bobrow, the previous Chairman, had assumed the position in 1974, the Department of Government was badly divided. When he left in 1977, the internecine conflicts had, if anything, been intensified. In an attempt to upgrade the Department, Dr. Bobrow had brought in promising young Professors but had downgraded and disparaged senior members of the faculty.

Although he testified that it would have been improper for him to have a formal role in the search procedures, the evidence indicates that Dr. Bobrow had a good deal to do with the selection of the Search Committee's Chairman and its members. In September 1977, Provost Polakoff had been at the University for only a few months. In suggesting to the new Provost the names of members of the Department to be put on the Search Committee, Dr. Bobrow had not included either Professor Plischke (a former Chairman), or Professor Piper (another former Chairman) or even Professor Hathorn (the Acting Chairman who was not interested in the permanent position). Dr. Bobrow had also recommended the Chairman of the Search Committee. Dr. McGuire, who became Chairman of the Committee, was Dr. Bobrow's first choice for that position. All of the members of the faculty of the Department who served on the Search Committee had been recommended by Dr. Bobrow. Some two-thirds of the Search Committee members had received appointments to the Department during the time that Dr. Bobrow was Chairman, including in particular Associate Professor Hardin, Associate Professor Elkin and Professor Young, who had come to Maryland in 1975 and 1976, who had originally proposed plaintiff's name and who had championed his candidacy throughout.[23] Quite clearly, the "old guard" was not represented on the Search Committee, and Dr. Bobrow's "new guard" had been placed in control. Senior members of the Department were unhappy about the composition and methods of the Search Committee, and this intra-department bitterness and divisiveness continued during the entire period when plaintiff's proposed appointment was pending before the President of the University.

Plaintiff's name had not been included on the original list of some 100 possible candi-

21. A negative opinion concerning plaintiff's qualifications for the chairmanship at Maryland was likewise received from another political scientist at Stony Brook, who had been a personal friend of President Toll while he had been at that institution.

22. Both President Toll and Dr. Hornbake kept notes of this meeting, and their notes are a part of the record in this case.

23. Dr. Hathorn testified at the trial that the Search Committee had been "stacked" with Bobrow people.

dates for the position. However, in early January, Drs. Young, Hardin and Elkin had met together at a delicatessen and had agreed that plaintiff's name should be proposed to the Committee. At Committee meetings, these three backed plaintiff over all other candidates, and they continued vigorous efforts in his behalf during the course of the entire controversy.[24] At a meeting with Provost Polakoff, they had persuaded the Provost to recommend plaintiff for the appointment.

Most of the members of the faculty who attended the July 11 meeting favored the appointment but approximately one-third of those attending expressed their opposition. Members of the Search Committee spoke in support of the process which had resulted in the recommendation of plaintiff for the position, claiming that it was an open and fair procedure. Members of the faculty who had not been on the Search Committee pointed out irregularities in the process, particularly during the later period of the search. The composition of the Committee was attacked by some of those who spoke. It was noted that letters of recommendation supporting plaintiff were solicited and received after the offer had been made and accepted.[25] The observation was also made that a serious candidate was visiting the campus at the time the offer was made to plaintiff. It was further pointed out that no vote among the faculty had been taken concerning the offer of a professorship to plaintiff until after the offer had been made.[26] When this omission had been called to his attention, Professor Polakoff

had eventually arranged for such a vote on April 12. Although the vote was in favor of plaintiff, the procedures employed were criticized. Signed ballots were required and later retained by the Provost. Some members of the faculty feared reprisals from the Provost, who had already recommended plaintiff at the time the vote was taken. Others saw the voting process as, in effect, a vote of confidence for Provost Polakoff by those faculty members who were enthusiastic about the new Provost and who were thus eager to support him.

Faculty members at the July 11 meeting were also sharply divided concerning the qualifications of plaintiff to be Professor and Chairman of the Department. Members of the Search Committee and others favoring the appointment described plaintiff as a first-class scholar and defended his objectivity and fair-mindedness. Among those who spoke in opposition was Acting Chairman Guy Hathorn.[27] He had earlier been fully supportive of the search process and of the Search Committee's recommended candidate. However, by July 11, he had changed his view, and he did not then endorse the appointment. Dr. Hathorn had read several of plaintiff's articles, had found some of them to be "polemical" and had concluded that one of the purposes of plaintiff's course on Marxism was to recruit students to his point of view. Hathorn also noted that one of the first acts taken by plaintiff after the offer had been accepted by him was to recruit a Marxist for the faculty.[28]

24. Dr. McGuire testified that Drs. Young, Hardin and Elkin favored plaintiff because they wanted to "leapfrog" ahead.

25. Dr. Hathorn testified that letters of this sort are not worth much when received after an appointment has been recommended.

26. To be Chairman of the Department, plaintiff would have to be appointed a full Professor. It had generally been the practice at Maryland for members of the faculty of a Department to vote on professorships before any such offers were made.

27. Unlike so many other members of this badly divided Department, Dr. Hathorn was liked and respected.

According to Dr. Bobrow (the former Chairman, who testified for plaintiff), Dr. Hathorn was a good man and a good judge of people.

28. Professor Polakoff was dismayed when he learned that plaintiff, even before the President had even received the Chancellor's recommendation, had invited Dr. Alan Wolfe, a Marxist Professor from California, to come to Maryland for interviews in late March so that he might be considered for hiring as a member of the faculty. Since Wolfe was already on his way when Polakoff learned of this, approval was finally given for Wolfe to come merely as a lecturer rather than as a candidate for appointment to the faculty.

President Toll had been impressed by the remarks made at the meeting by Professor Elmer Plischke, a senior member of the faculty and a previous Chairman of the Department. Toll had known Plischke for many years. When President Toll had been at Maryland some years earlier as Chairman of the Department of Physics, Professor Plischke had then been Chairman of the Department of Government and Politics. They had worked together on many projects, and President Toll had come to respect Plischke and felt he could rely on his judgment.

From the outset, Professor Plischke had not supported plaintiff's candidacy, but his views had not been requested until the offer had been made. Professor Plischke raised questions at the July 11 meeting concerning plaintiff's scholarship, his administrative experience and his experience in securing government grants. He wondered why plaintiff was then merely an Associate Professor at N.Y.U., and he doubted whether plaintiff had the qualifications to be a full Professor at Maryland. Professor Plischke had recently been Chairman of the Search Committee seeking a new head of the Department of Sociology, and he stated that all candidates who had been brought to the campus for consideration for that position had much more administrative experience and experience in securing grants than did plaintiff.

Others who opposed the appointment included Professor Piper, who had in the past been Chairman of the Department for a period of six years. Like Acting Chairman Hathorn, Professor Piper had initially favored the appointment but had changed his views as more information concerning plaintiff came to light. Among the senior members of the faculty who favored the appointment was Professor Thornton H. Anderson, who had been at Maryland since 1950. He liked the idea of having a Marxist as Chairman because he thought that the University could capitalize on the publicity

if that were to occur at an institution so close to the national capital. In his testimony at the trial, Professor Anderson characterized the appointment of a Marxist to this important post as "an interesting experiment" and a "tantalizing idea" which would give national visibility to the Political Science Department at Maryland.[29] It was his opinion that the recommendation of Ollman would never have been made by the Search Committee had a substantial number of the members of the Search Committee not shared his views concerning the desirability of such an interesting experiment.

Members of the Department who had not been able to attend the July 11 meeting were asked by President Toll to submit letters giving their views on the Ollman matter. A number of letters were received and reviewed by President Toll during the week following the faculty meeting, some in support of and some in opposition to the appointment. President Toll also communicated with several other political scientists during that time period and considered their comments concerning the appointment. He also spoke briefly with Dr. McGuire, Chairman of the Search Committee, and learned that Dr. McGuire had not made his own evaluation of the qualifications of plaintiff but had relied primarily on the members of the political science faculty on the Committee.

At a meeting of the Board of Regents held on July 18, President Toll told the Board that he was ready and willing to act on all matters which were his responsibility under the By-laws, including the Ollman appointment. The Board unanimously reaffirmed his authority under the By-laws to make the decision.

On July 19, President Toll met with Dr. Hornbake and discussed the Ollman appointment. For many years, Dr. Hornbake, as one of his most important responsibilities as Academic Vice President of the University of Maryland, had been reviewing papers relating to faculty appointments which had

---

**29.** Dr. Alker, a Professor at M.I.T., who was called to testify by plaintiff, also saw the Ollman appointment as an "exciting possibility." He also believed that the Department at Maryland could attain visibility by having a specialty flavor.

been forwarded to the President and had been making recommendations to the President concerning the action to be taken. When the Ollman recommendation had been forwarded to President Elkins in late April, Dr. Hornbake, in the course of his review, had noted various irregularities in the search procedures. Questions had also arisen in his mind concerning plaintiff's qualifications for the position. Dr. Hornbake had read, among other works of plaintiff, his article entitled "On Teaching Marxism." *See The Insurgent Sociologist,* Vol. VI, No. 4, Summer 1976, pp. 37–50. Among the other statements made by plaintiff in this article were the following (pp. 48–49):

What are the practical results of my course on Marxism? How can one judge them? Most students who answer the question, "Why are you or aren't you a Marxist?", indicate at the end of the course that they now accept Marx's analysis (although the majority are still wary of the label "Marxist"). Where this happens, these students know better than most comrades with whom I have talked when and how they adopted a Marxist outlook.

\* \* \* \* \* \*

If non-Marxists see my concern with such questions as an admission that the purpose of my course is to convert students to socialism, I can only answer that in my view—a view which denies the fact/value distinction—a correct understanding of Marxism (as indeed of any body of scientific truths) leads automatically to its acceptance.

\* \* \* \* \* \*

\* \* \* Furthermore, I do not consider that I introduce more "politics" into my course than do other social science professors, or that I am any more interested than they are in convincing students of the correctness of my interpretations. If my concern with a teaching strategy suggests manipulation (whereas, supposedly, their concern with pedagogy is morally neu-

tral), I can only reply that, the truth being what it is, I have no interest in lying, or in hiding any facts, or in misleading students in any way.

Along with a growing number of socialist teachers, I have become very concerned with pedagogy, because we have learned (usually the hard way) that truth doesn't always win out in the struggle with half-truths and lies, that it doesn't always forge its own means of expression, that the very complexity of a Marxist analysis invites confusion and easy caricaturing, that our own personalities and shortcomings often come between what we have to say and our audiences, and that these audiences have undergone an *ideological preparation* that all but immunized them against our message.[30]
\* \* \*

From his readings, Dr. Hornbake had concluded that plaintiff was doctrinaire in his approach to the teaching of Marxism and that plaintiff intended to indoctrinate his students concerning the truth of his beliefs. Dr. Hornbake passed along to Dr. Elkins the conclusions he had reached from his review of plaintiff's works.

Dr. Hornbake had eventually prepared for President Elkins a memorandum dated June 15, questioning plaintiff's administrative experience for heading a department as large as this one and further questioning Dr. Ollman's national reputation as a scholar. Thereafter, Dr. Hornbake had recommended to President Elkins that plaintiff not be appointed to the position.

After July 1, Dr. Hornbake continued his review of the matter and considered the new information which had come to light during the first two weeks of July. When he met with President Toll on July 19, his overall assessment was that the appointment should not be approved. From his knowledge of the complexity of the Department of Government and Politics and its size and state of being, it was Dr. Horn-

**30.** Martin Sklar, writing in *Studies in Socialist Pedagogy* (1978), p. 263, criticized plaintiff for presenting "Marxism as some eternal canon of Truth, or as sacred texts set apart or 'above' the rest of the human world of thought."

bake's opinion that more administrative talent and ability were required for the Chairman than that possessed by the plaintiff. Dr. Hornbake furthermore had reservations concerning plaintiff's scholarship, noting that plaintiff was an Associate Professor at N.Y.U. with no indication of further development which would suggest promotion to a full Professorship either at N.Y.U. or at Maryland.[31] He also pointed out to President Toll that Dr. Ollman had no experience in obtaining research grants and that this was a specific requirement included in the charge to the Search Committee. Dr. Hornbake was disturbed that Dr. Ollman had stated his intention of making the Maryland Department of Government and Politics the leading one in the country for the study and use of Marxist approaches in the political science field. According to Dr. Hornbake, this was a change in the direction which the Department had taken in the past and would involve the commitment of new resources.

It is apparent from the record that President Toll considered and gave weight to Dr. Hornbake's opinion concerning the Ollman appointment. President Toll had known and worked with Dr. Hornbake when Toll was at Maryland between 1953 and 1965 as Professor and Chairman of the Department of Physics. President Toll had tremendous respect for Dr. Hornbake's ability as an academic officer, and in his testimony, characterized Dr. Hornbake as "truly one of the finest academic officers, chief academic officers, that any university ever had." [32]

### (c) President Toll's decision

President Toll reached his final decision to reject the proposed appointment during the evening of July 19. The next day, he announced his decision at a meeting of the Board of Regents. In his written statement presented at that meeting, President Toll, among other things said the following:

\* \* \* \* \* \*

When I became President of the University of Maryland on July 1, 1978, there were several recommendations for appointments that were awaiting action by the President, and I have been acting on each one as rapidly as I could, consistent with my other responsibilities and the necessary consultation and careful review in each case. Among these cases was the consideration of Dr. Bertell Ollman, a candidate for the position of Professor and Chairman of the Department of Government and Politics at the University of Maryland at College Park. This morning I have decided, after appropriate consultation and review concerning this case, *not* to approve the appointment, as I will explain more fully below.

\* \* \* \* \* \*

This is not the first case of those pending before me on July 1 that I have decided *not* to approve after careful study. However, this is the first case of denial of appointment in which I am making a statement to the Regents. I do so because this case was previously reported to the Regents while it was under review and after it attracted wide public interest. The candidate himself held a press conference just last Monday to make a public statement. I therefore felt it was important to make this statement to the Board of Regents in order to avoid any misunderstandings.

In each decision on appointments, I make a determination on the basis of my judgment of the qualifications for a par-

---

**31.** Plaintiff has commercial as well as scholarly interests. In the spring of 1978, plaintiff was also engaged in the marketing of a board game he had developed, called "Class Struggle." Since his rejection at Maryland, he has entered into a contract with Warner Brothers to make a movie of his life (which would include incidents concerning the University of Maryland), and he has negotiated with William Morrow & Company, a book publisher, concerning publication of his autobiography entitled "The True Confes-

sions of a Marxist Businessman—Class Struggle is the Name of the Game."

**32.** Having seen and heard Dr. Hornbake during his testimony in this case, this Court found him to be an impressive witness. Dr. Hornbake was obviously a man of great integrity and ability, who had faithfully served the University in various different capacities over a period of many years.

ticular appointment of the candidate who has been proposed. I wish to stress that, in my opinion, it would be improper and illegal to base any decision on a candidate's personal opinions, political beliefs, or religious convictions. My responsibility is to judge the qualifications of a candidate to perform the duties of teaching, research, and service and, in addition for a candidate for chairman, to perform the important administrative responsibilities of that position. We aim in our search procedures to determine the best possible candidate for each appointment.

In my opinion, the Department of Government and Politics of the University of Maryland at College Park should be able to develop over the next decade into one of the best political science departments in the United States. The outstanding resources of the State of Maryland, and the nearness to the unique resources in the nation's capital, make College Park a highly desirable location for outstanding students and faculty in political science; indeed, I do not know of a better location anywhere in the world for this particular discipline. We should be able to retain and to recruit faculty that will match the very best in the nation. In recruiting a candidate for Professor and Chairman of this Department, we must keep this high goal and great opportunity in mind.

\* \* \* \* \* \*

There has been wide public discussion of this proposed appointment, much of it focusing on issues that are not appropriate. For example, some persons have said that they felt I should approve the recommendation, even though it was not merited, because others might believe that the appointment had been refused on account of the candidate's political beliefs. I must stress as clearly as I can that appointment decisions at the University of Maryland are not and shall not be based on political beliefs, but shall be based on the qualifications of the candidate for the duties of the position involved.

\* \* \* \* \* \*

Some people who have agreed that this candidate is not the best who could be made Chairman of the Department of Government and Politics at College Park have nevertheless urged that the appointment be made because of the editorials that have been written in major newspapers or the indications that national organizations might criticize the University if the appointment is not made. I believe that a university must be willing to stand up firmly to such outside pressures.

\* \* \* \* \* \*

One person has said that, although in his judgment the candidate did not have the qualifications in teaching, scholarship, and administrative ability that one should seek for this post, he was tempted to recommend the appointment in order to avoid the threat of a legal suit. I believe that academic administrators must have the courage to defend proper academic standards against all forms of outside pressure. In my opinion, it would be just as wrong to give in to the threat of a legal suit as to any other outside pressure.

In summary, although there has been considerable pressure for this proposed appointment from outside the University, mostly from people who have not carefully examined the qualifications of the candidate, I have viewed such pressure as irrelevant in reaching my decision. To the best of my ability, the decision has been based upon my evaluation of whether or not the proposed candidate is the best qualified person we can reasonably hope to get as Professor and Chairman of the Department of Government and Politics at UMCP.

\* \* \* \* \* \*

(d) *Discussion*

On the record here, this Court finds and concludes that plaintiff has not met his burden of proving that his Marxist beliefs were a substantial or motivating factor in President Toll's decision not to appoint him as Professor and Chairman of the Depart-

ment of Government and Politics at the University of Maryland. What must be determined here is the real reason for the adverse decision. See *Williams v. Day*, 412 F.Supp. 336, 340 n.1 (E.D.Ark.), *aff'd*, 553 F.2d 1160 (8th Cir. 1977). The evidence in this case indicates that the reasons assigned by President Toll in his statement of July 20 and in his testimony were the true motivating factors for his decision. President Toll did not base his decision on plaintiff's Marxist beliefs. Rather, he acted as he did because it was his considered judgment that plaintiff did not possess the qualifications to develop the Department of Government and Politics in the manner in which President Toll thought it should develop.

The evidence indicates that the reasons assigned by President Toll for his decision were sincere ones, that there was an adequate factual basis for the conclusions reached and that he had fairly and conscientiously reviewed the entire matter before reaching his decision. Whether or not this Court might agree with President Toll concerning the direction which the Department should take and the qualifications of a Chairman to lead the Department in that direction, it is not for this Court to substitute its judgment for that of the University's Chief Executive Officer, so long as a legally impermissible reason was not the substantial or motivating factor. *Shaw v. Board of Trustees of Frederick Community College, supra* at 932.

Even if this Court were to conclude (as it has not) that plaintiff had carried his initial burden and had proved that his political beliefs were a motivating factor in President Toll's decision, the result in this case would still be the same. For the reasons stated at length herein, this Court finds and concludes that defendants have shown by a preponderance of the evidence that President Toll would have reached the same decision as to plaintiff's employment even in the absence of the protected beliefs. *See Mt. Healthy City Board of Education v. Doyle, supra* 429 U.S. at 287, 97 S.Ct. at 576. As the Supreme Court there explained, the rule of causation in a case such as this one should not focus solely on whether the plaintiff's protected activity played a part in the decision not to hire him. In *Mt. Healthy*, the Supreme Court pointed out that if such an approach were adopted, a person like plaintiff would be placed "in a better position as a result of the exercise of constitutionally protected conduct than he would have [otherwise] occupied * * * The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct." 429 U.S. at 285–286, 97 S.Ct. at 575. Whether or not plaintiff was a Marxist and whether or not that fact had significance to President Toll, plaintiff did not in President Toll's judgment possess the qualifications for the position. Defendants have thus here met their burden of showing that plaintiff would not have been hired in any event.

In contending that he has met his burden of proof in this case, plaintiff asserts that President Toll's decision was influenced by improper comments made by public officials and others. Plaintiff relies on statements that a Marxist should not be appointed as Chairman of the Department at Maryland made by the Governor, by legislators, by private citizens, by several members of the faculty and of the Board of Regents, and by newspaper columnists. It is further contended that President Toll acted as he did because he feared that the University's budget would be cut if a Marxist were appointed to an important position such as this one.

The evidence in the case does not support these contentions. President Toll was certainly aware of the wide-spread comment which this recommendation had evoked. He was also fully aware of the fact that his decision concerning this appointment could not and should not be based on plaintiff's political beliefs. Following careful study and analysis of all the factors, President Toll made the ultimate decision based on his honest appraisal of plaintiff's qualifications for the particular position.

Plaintiff argues that President Toll succumbed to the pressure brought upon him

and his predecessor, President Elkins, resulting from the continuing adverse comments and publicity during the three-month period after the matter became public knowledge. But, there was also pressure brought by persons and organizations favoring the appointment. The American Association of University Professors announced in April that if Dr. Ollman was rejected for the position, the University would be sued. Various members of the faculty supported such a suit, including Dr. Hardin of the Search Committee who spoke to various attorneys and urged that press coverage should be pushed. Plaintiff himself held a press conference in Washington on July 17, stating that if he was not appointed immediately, suit would be filed.[33] Plaintiff correctly points out that many of the opponents of the appointment improperly based their opposition on the legally impermissible ground that plaintiff was a Marxist. But equally unsound comments were made by certain proponents who, without detailed knowledge of plaintiff's qualifications for the appointment, took the position early in the controversy that any rejection would necessarily have to be based on plaintiff's Marxist beliefs. As the Supreme Court emphasized in the *Mt. Healthy* case, a person like plaintiff should not, merely because of his political beliefs, be able to insulate himself from review and prevent his prospective employer from assessing his qualifications and reaching an employment decision based on all the pertinent facts. 429 U.S. at 286, 97 S.Ct. at 575.

President Toll recognized the outside pressure from both proponents and opponents of the appointment. He resolutely refused to yield to the blandishments of either side, and made the decision based on the facts as he saw them. He was an experienced Chief Executive Officer of a State institution and was fully capable of focusing on the essentials and making a decision based on his own professional judgment.

Plaintiff also relies heavily on facts in the record indicating that appointments of this sort were in the usual case routinely and speedily approved by the President of the University after recommendations had been received from both the Provost and the Chancellor. But the Ollman matter was unique, and what may have been done before or after in other cases has little relevance here. Certainly, there had never before 1978 been an appointment like this one faced by a President of the University. Indeed, it is difficult to believe that anything approaching a matter as controversial and publicized as this one could ever occur in the future. A badly divided Department was involved. There were irregularities in the search procedure, which had initially been speeded up but later, after an offer had been made and accepted, slowed down so that the deficiencies could be corrected. There were press reports concerning the appointment before the Chancellor's recommendation had even been received by the President. There were threats of suit before the President had even had an opportunity to review the matter. Most important of all, President Elkins was scheduled to retire shortly after the matter was presented to him for a decision. Because of these unique facts, little weight will be given to the *manner in which previous appointments had been handled by President Elkins.*

In any event, it was President Toll and not President Elkins *who made the ultimate* decision. What President Elkins may or may not have done in other cases was of little concern to President Toll, who acted on the basis of his own investigation of the matter as well as on the basis of facts contained in the materials turned over to him by the retiring President.

Plaintiff challenges the manner in which President Toll conducted his own independent review of the appointment. Plaintiff claims that President Toll relied on persons unqualified to give an opinion about him, that Toll intentionally asked such persons

---

**33.** The press conference was followed by a rally of plaintiff's supporters at the College Park campus.

misleading questions, that he falsified or modified their responses in his notes, and that he ignored relevant evidence contained in his own files. There is no support in the record for these extreme charges. On the contrary, this Court finds from the evidence that President Toll conducted his investigation of the appointment in a fair and open-minded manner. The outside referees were fairly selected by him, the questions he asked them were proper, and his notes accurately recorded their comments. Indeed, those referees who testified at the trial, either in person or by way of deposition, corroborated in substantial part the testimony and notes of President Toll concerning the statements made by them in early July of 1978. Where there are differences between President Toll's version and the testimony of these individuals, this Court will credit President Toll's account as contained in his notes. These notes were made contemporaneously with the conversations in July of 1978 while the testimony of the individuals themselves was based on their recollections stated in depositions taken a year or more later.

In seeking to sustain his burden in this case, plaintiff places heavy reliance on evidence in the record that distinguished scholars recommended his appointment for the position. But there is substantial evidence in the record to the contrary furnished by other distinguished political scientists. And the impartiality and timing of those who wrote letters supporting plaintiff is subject to question. Plaintiff himself supplied the names of a number of the political scientists who wrote letters to the Search Committee recommending him for the position. At least one of the letter writers knew when he recommended plaintiff, that a conditional offer had already been made and that plaintiff had already accepted.

There was little before President Toll to indicate that plaintiff had sufficient administrative experience to be placed in charge of a large and divided department such as this one at the University of Maryland. Professors Berlin, Lukes and Bey, each of whom wrote letters recommending plaintiff for the position, all stated that they had no

knowledge concerning his administrative abilities. Professor Roelofs, who was a colleague of plaintiff's in the Department of Politics at N.Y.U., conceded that although plaintiff had organized conferences on Marxist studies with great success, his "administrative experience is not yet extensive." And there was even less before President Toll to indicate that plaintiff had experience in seeking and obtaining research grants, whether from the government or from a foundation.

Plaintiff contends that the evidence produced shows that he is well qualified for the position in question. But it is not for this Court to second guess the decision made by President Toll by weighing the evidence and determining whether plaintiff has the necessary qualifications for the position. *Cherry v. Burnett, supra* at 332. The Supreme Court has cautioned against further enlarging "the judicial presence in the academic community." *See Board of Curators v. Horowitz*, 435 U.S. 78, 90, 98 S.Ct. 948, 955, 55 L.Ed. 124 (1978). The question is whether this particular President of this University, charged with the heavy responsibility of charting the future course of this large State institution, in good faith made a decision which he believed would produce the best qualified person for the position in question. As the Fourth Circuit noted in *Clark v. Whiting*, 607 F.2d 634, 639 (4th Cir. 1979), a teacher's competence and qualifications for tenure or promotion are by their very nature matters calling for highly subjective determinations. Even if President Toll were mistaken in his evaluation of plaintiff, this Court should not set aside his decision unless it was based on a constitutionally impermissible reason. In view of the facts he had before him, President Toll's decision was a reasonable one, which was honestly and conscientiously reached after he had weighed all competing considerations. As the Tenth Circuit said in *Franklin v. Atkins, supra* at 1190, the decision maker must do "the proper sorting" for himself of the great variety of information which comes to his attention. Mere "consideration" of improper or constitutionally

protected conduct or beliefs does not *ipso facto* constitute a violation of constitutional rights justifying remedial action. *Id.* at 1190.

Finally, plaintiff contends that defendant Toll's decision was motivated by plaintiff's participation in the so-called Bennett and Courant affairs at N.Y.U. in 1970. Plaintiff asserts that on those occasions he was merely exercising his constitutional rights and that defendant Toll impermissibly based his decision on plaintiff's protected conduct.

In 1970, Dr. Ivan Bennett was Dean of the N.Y.U. Medical School, Vice President of that University and Director of its Medical Center. In April of 1970, plaintiff had joined certain medical students and others in demanding that Dr. Bennett be removed from these positions because he had been involved in research in chemical and biological warfare. Plaintiff took the position at the time that Dr. Bennett's appointment as Dean and Director brought the University closer to the Pentagon than desirable.

The Courant Institute was located in a building which housed the Mathematics Department at N.Y.U. In the late spring of 1970, a group of students and others occupied the building. Plaintiff and Professor Jack Zipes were members of a University-wide Strike Committee which supported a student strike at N.Y.U. because of the invasion of Cambodia and the Kent State affair. When police arrived to clear the building of students, the Strike Committee formed a cordon around the building to prevent the police from seizing students who were coming out of the building at the time. According to Professor Zipes, plaintiff was present during this confrontation and was then a member of the Committee which had decided to prevent the police from reaching the students.

Although others had attached significance to plaintiff's participation in the Bennett[34] and Courant[35] affairs, President Toll gave very little weight to these matters in reaching his decision to reject the appointment. President Toll had known Dr. Bennett for a number of years and had great respect for him. He testified that he thought that plaintiff had shown poor administrative judgment in participating in these events as he had. Whether or not plaintiff's participation in the Bennett and Courant affairs at N.Y.U. in 1970 was entitled to constitutional protection, this Court concludes that plaintiff's activities and conduct at that time were not substantial or motivating factors in President Toll's ultimate decision.

### IV

### *The claim against defendant Elkins*

█ Plaintiff's claim against defendant Elkins must likewise fail. Three defendants have been named by plaintiff in this case: the former President, the new President (who made the decision) and the Board of Regents (which was in existence while both Presidents were in office). Plaintiff is here seeking relief because he did not receive employment at the University, and to be entitled to judgment against a particular defendant, he must show that the decision not to hire him was made by that particular defendant. As the Second Circuit noted in *Selzer v. Fleisher*, 629 F.2d 809, 814 (2d Cir. 1980), the *Mt. Healthy* rule of causation must be applied to each defendant separately. It is the motives of the decision-maker which must be examined by the trier of fact in each case. *Mabey v. Reagan*, 537 F.2d 1036, 1045 (9th Cir. 1976).

Insofar as President Elkins is concerned, plaintiff contends that his constitutional

---

**34.** Dr. David Robinson, who had held an administrative position at N.Y.U. in 1970, told President Toll that he had strongly disapproved of plaintiff's activities at N.Y.U. in connection with his efforts to have Dr. Bennett dismissed.

**35.** Dr. Peter Lax, Director of the Courant Institute and President of the American Mathematical Society in 1978, wrote a letter which was forwarded to President Elkins, opposing plaintiff's appointment at Maryland because plaintiff had played "a disgraceful role" in the occupation of the Institute in 1970, had "egged on the students" and "was one of the ringleaders."

rights were infringed when this defendant did not act on the appointment between April 21, 1978, when the recommendation was received in the President's office, and June 30, 1978, when defendant Elkins retired as President. There is no merit to this contention.

As the evidence indicates, defendant Elkins did not make the decision which resulted in the losses allegedly sustained by the plaintiff. This Court is aware of no case which has held that mere delay for a few months of an appointment which is later rejected would amount to a violation of a teacher's constitutional rights under § 1983, if improper motives were a factor in the delay. Plaintiff had no right to be employed at any particular time, and an appointing authority is entitled to review with care a controversial hiring proposal. There was in this case no definitive administrative determination made by President Elkins which deprived plaintiff of his constitutional rights. *See Hussey v. Sullivan*, 498 F.Supp. 594, 596 (D.Mass.1980).

But even if the law were to recognize mere delay as grounds for a § 1983 action, the facts of this case indicate that plaintiff is entitled to no recovery against the former President of the University. President Elkins delayed his decision for reasons unrelated to plaintiff's Marxism. He first learned of the Ollman matter on April 18, 1978, when he saw the article in *The Diamondback*. Chancellor Gluckstern had called him on the evening of April 20 and had informed him that a letter recommending plaintiff for the position would be forthcoming. On April 21, the Chancellor's letter of April 19, with enclosures, was received. By April 24, President Elkins had been advised that if the proposed appointment was turned down, the University would be sued. Meanwhile, Chancellor Gluckstern had left for a trip to Taiwan. It was not until late April or early May that President Elkins was able to discuss the matter for the first time with Chancellor Gluckstern. At that time, President Elkins stated that he would not be rushed in making the decision.

As he reviewed the documents during early May, President Elkins became more and more concerned that irregular procedures had been employed in the case. Although the making of the offer to plaintiff had been rushed, there was a delay of over six weeks before the recommendation had been forwarded to the President. On May 18, he wrote to Chancellor Gluckstern, raising a number of questions about the search procedures and the qualifications of Dr. Ollman. The Chancellor responded by letter dated June 7. President Elkins noted that the offer had been made to plaintiff by Provost Polakoff before any written report had been received by the Provost and at the same time that the Committee was interviewing Dr. Cnudde, a prime candidate. He also noted that letters of recommendation were solicited and received after the offer was made and accepted. He further noted that plaintiff had been offered a professorship without the approval of the faculty of the Department and that a vote was finally taken on April 12 pursuant to questionable procedures whereby the Provost required faculty members to vote by signed ballots and then retained the ballots.

By mid-June, President Elkins had determined, after consulting with Dr. Hornbake, that the appointment should be rejected. President Elkins did not believe that plaintiff had the administrative or other broad experience to provide effective leadership for this badly divided Department. However, in view of his impending retirement as President, President Elkins concluded that he should not make the final decision.

Fresh in President Elkins' mind was the time and effort he had expended in a recent case in this Court in which he and the University had been sued. In *Cussler v. The University of Maryland, et al.*, 430 F.Supp. 602, a sociology professor had sued the University of Maryland, the Board of Regents, Dr. Elkins and various other officials of the University under 42 U.S.C. § 1983, claiming sex discrimination in her employment. The jury trial in that case commenced on November 23, 1976 and concluded with a verdict in favor of the de-

fendants on March 24, 1977. President Elkins was in attendance throughout the trial, which was an exhausting one for all concerned. He was fearful in June of 1978 that if he rejected the appointment, he would be subjected to a similar protracted litigation, which would come up during the time of his retirement and with respect to which he might have to engage private counsel. As President Elkins testified, he would not because of his retirement have the resources or control over any such suit that he would otherwise have had if he had remained in office as President.[36] For these reasons, President Elkins acted more cautiously in dealing with the Ollman proposed appointment than with any other appointment which had come up during his entire term of office. Even though he was satisfied in his own mind that the appointment should be rejected, he decided to ask the Board of Regents to make the decision. At the meeting held on June 16, President Elkins requested the Board to decide whether the proposed appointment should be approved or rejected.

The Board of Regents, however, was not receptive to this suggestion made by President Elkins. There were various legal problems. Before the Board of Regents would be empowered to decide whether to hire plaintiff, the By-laws would have to be amended. Several of the Board, including Regent Tydings, had serious questions concerning the advisability of the Board's making the final decision on the Ollman appointment. The Board of Regents was not organized to make the decision in question, and extensive procedures for hearing and consideration of the matter would have to be instituted before the Board acted. The matter was discussed in several Board meetings between June 16 and June 30, but no decision was ever reached by the Board

as to whether it, rather than the President, should ultimately make the decision. On June 30, President Elkins' retirement became effective, and he had nothing further to do with the Ollman matter after that date.

These facts establish not only that defendant Elkins made no decision which denied plaintiff his constitutional rights but also that there were good reasons for the delay in question. Particularly since President Elkins was retiring and since he would have been sued had he followed his inclination and rejected the appointment, defendant Elkins was fully justified in treating this appointment differently from any of the others which had come before him during his term as President.

Plaintiff contends that defendant Elkins delayed his decision because of attacks on plaintiff's Marxism made by public officials and private citizens. But, as discussed herein, there was also genuine opposition to the appointment which was not based on legally impermissible reasons.[37] Besides members of the faculty who opposed the appointment, there were other knowledgable individuals who urged its rejection. Dr. Louis Kaplan, a former Chairman of the Board of Regents, had read some of plaintiff's writings and had concluded that plaintiff would seek to indoctrinate his students if he became a Professor at the University of Maryland.[38] Dr. Kaplan possessed impressive academic credentials, having been President of Baltimore Hebrew College for forty years and having also taught at Goucher College.

Dr. B. Herbert Brown, who was Chairman of the Board of Regents at the time, opposed the appointment of plaintiff on various grounds. He was in favor of promoting someone from within the Depart-

---

**36.** Had he been President at the time he was sued, he knew that the Attorney General of Maryland would have represented him. However, he did not know whether he would be entitled to representation at the expense of the State had his retirement become effective.

**37.** This Court accepts the testimony of defendant Elkins that he did not tell a newspaper

reporter that the possibility that some legislators might react to the appointment by cutting the University's budget would be a factor in his decision regarding Ollman.

**38.** Dr. Kaplan testified that it was his opinion that openmindedness was very important for a teacher, who should not be permitted to manipulate students, particularly young people.

ment to be Chairman, and he was concerned about plaintiff's administrative inadequacies. Although both Dr. Kaplan and Dr. Brown had urged Chancellor Gluckstern to withdraw his recommendation of plaintiff, they both told President Elkins that they would support his decision whatever it might ultimately be.

The most that can be said on this record is that plaintiff's Marxism was a factor, although not a substantial or motivating one, for the delay that occurred. The widespread publicity and comment caused University officials to take a close look at both procedural and substantive aspects of the appointment. When they did, both Dr. Hornbake and Dr. Elkins concluded that the plaintiff was not qualified for the position.

In any event, it is apparent that plaintiff suffered no loss because of the delay. Had Dr. Elkins acted before he retired on June 30, he would have turned down the appointment for reasons which he honestly believed were in the best interests of the University. As a result of the delay, plaintiff gained the benefit of having a new President undertake a further investigation and take a fresh look at the appointment. When he did, President Toll arrived at the same decision as had President Elkins.

For the reasons stated, plaintiff has not met his burden of proving a case against defendant Elkins.

## V

### The claim against defendant Board of Regents

■ Little time need be spent in discussing plaintiff's claim against the Board of Regents of the University of Maryland. The Board did not make and could not legally have made the decision which resulted in plaintiff's rejection for employment at the University. As discussed previously, it is the decision-maker who is accountable in a suit such as this one brought under § 1983, if he or it acts for legally impermissible reasons. The involvement of the Board of Regents in the Ollman matter was peripheral, and the Board played no part in President Toll's ultimate decision.

Indeed, at the time that President Toll acted and at all previous times pertinent to the issues in this case, the Board of Regents had no legal authority to either accept or reject plaintiff for the position of Chairman of the Department of Government and Politics. Although there was discussion at Board meetings of President Elkins' request that the Board make the decision, that suggestion was never adopted by the Board. Moreover, the By-laws were never amended. Indeed, there was never even a meeting of the Board at which the By-laws could have been legally amended. Amendment of the Board's By-laws required a special meeting with seven days' notice that the matter of amending the By-laws was on the agenda for the special meeting.

Quite clearly, appointment procedures at the University of Maryland differed from those at the University of Colorado, as discussed in *Franklin v. Atkins, supra.* In that case, a Marxist had applied for a faculty position in the English Department. The Board of Regents at that University had the ultimate authority to approve or reject the appointment. The ultimate vote was 8–1 against approval, and it was therefore necessary for Chief Judge Arraj to review the reasons given by each of the eight members of the Board to determine whether the plaintiff's constitutional rights in that case had been infringed. *See* 409 F.Supp. 447–448. After such review, Judge Arraj concluded in that case that the plaintiff's rejection had not been based primarily on objections to his political beliefs or associations. 409 F.Supp. at 452. This decision was affirmed by the Tenth Circuit. *Franklin v. Atkins,* 562 F.2d 1188 (10th Cir. 1977).

In this case, the decision-maker was defendant Toll. Therefore, defendant Toll's reasons have been the ones which this Court has critically examined to determine whether plaintiff has met his burden in this case. Since the Board of Regents played no role in the making of the ultimate decision, plaintiff's claim against that defendant must also fail.

## VI

### Pretextuality

■ One of plaintiff's principal arguments in this case is that the reasons given by all defendants for acting as they did were pretextual and that plaintiff's Marxism was the real reason why he was rejected by the University. Plaintiff has characterized the actions taken by President Toll between July 1 and July 20, 1978 as a "charade," and the reasons stated by him and by President Elkins for rejecting the appointment have been called "sham."

These charges raise a substantial issue of credibility in this case. For this Court to find in favor of the plaintiff here, it would have to reject large portions of the testimony given under oath in open court by President Toll, by President Elkins and by Vice President Hornbake. This the Court will not do.

Rather than rejecting as unworthy of belief the testimony of President Toll, President Elkins and Vice President Hornbake, this Court will give full credit to what was said on the stand by each of these three key witnesses, particularly insofar as each of them described their motivations for acting as they did. The testimony of each of the three supports and corroborates that of each one of the others. Furthermore, extensive other evidence in the case, both exhibits and in-court testimony, supports the versions of these events described by each of these three in open court.

Moreover, this Court, in viewing and hearing these three witnesses and in considering their many years of experience in the field of higher education, found each of the witnesses to be impressive in a distinctly different way. Dr. Toll impressed the Court as a man of great integrity, who, as an experienced chief executive officer of a university should do, did not shirk from the unpleasant task of making a difficult decision. Dr. Elkins had served this very large state university for twenty-four years before his retirement on June 30, 1978. He had been a Rhodes scholar at Oxford, had presided over the tremendous growth of the University since 1954, and was hardly the sort of man who would give sham reasons for acting as he did. Dr. Hornbake had been the Academic Vice President of the University for eighteen years and had previously filled many important positions related to matters of higher education. His experience played an important part in the decisions he reached, and his calm and judicious demeanor in answering questions on both direct and cross-examination was hardly that of a dissembling witness.

Plaintiff's case is built essentially on unwarranted inferences derived from actions and statements of President Toll, Dr. Elkins and Vice President Hornbake. But the actions taken by each of these three men were conscientious and responsible ones, their views were honestly held, and their motives were clearly and sincerely stated in their testimony. The circumstantial evidence relied upon by plaintiff simply does not support his contention that President Toll, Dr. Elkins and Dr. Hornbake all had sinister and concealed motives for rejecting him for the position, particularly in view of the weight this Court has given to their sworn testimony in this case.

## VII

### Summary

There was a massive record in this case, and the parties have locked horns on a myriad of conflicting issues. When the welter of conflicting evidence is weighed and considered, the Court's decision may be summarized in a few brief sentences. First, the final decision concerning the appointment of the Chairman of the Department of Government and Politics at the University of Maryland was in 1978 committed exclusively to the judgment of the President of the University. Secondly, the decision in this case was made honestly and conscientiously by President Toll alone for reasons which he believed would promote his goal of improving the standing of the University. Thirdly, this decision was not based upon plaintiff's political beliefs. President Toll so testified, and this Court has accepted that testimony.

## VIII

### Conclusion

For the reasons stated, judgment will be entered in favor of the defendants, with costs.